OPINION OF THE COURT
CREAN, Senior Judge:
Contrary to his pleas, the appellant was found guilty, by a general court-martial composed of officer and enlisted members, of failing to obey a lawful regulation, rape, and unlawful entry, in violation of Articles 92, 120, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 920, and 934 (1988) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to Private El.
This court denied the appellant’s petition for new trial on the grounds of newly discovered evidence. United States v. Irvinspence, ACMR 9102640 (A.C.M.R. 2 April 1993) (unpub.). He now asserts that the evidence is not legally and factually sufficient to support the findings of guilty.[1] Oral argument was heard on 8 March 1994. We hold that the evidence is factually sufficient and affirm.
The stories of the incident, by the appellant and the prosecutrix, Private First Class (PFC) W, that gave rise to the offenses are diametrically opposed. Private First Class W testified that she worked the entire day, from 0600 hours to approximately 1800 hours, of Saturday, 27 July 1991, as a cook in the Second Infantry Division Support Command (DISCOM) dining facility at Camp Casey, Korea. Later that evening, she and some friends went “down range.”[2] During the evening, she drank at least a bottle of *892 champagne, several screwdrivers, and maybe some tequila. Shortly after midnight, she and her boyfriend, Specialist (SPC) L, returned to her room in the barracks and engaged in sexual intercourse. The boyfriend left the room at approximately 0150 hours, 28 July 1991. She does not remember locking the door after his departure. Sometime between 0200 and 0220 hours, she let her roommate, PFC S, into the room. Private First Class S got the key to the room and left.
Sometime later that morning, PFC W was awakened by pains in her vaginal area and on her neck. A naked man was on top of her with his penis in her vagina and his mouth on her neck.[3] She pushed him off of her, got up, and asked him who he was and what he was doing. He identified himself as “Eddie.” She noticed that he was wearing a condom. She wrapped herself in a blanket and went to the other side of the room to find that her roommate was gone. She then left and went to the room next door. She told a friend, PFC D, that she had been raped. As they talked, the appellant walked past them wearing only his shorts and carrying the rest of his clothing. Private First Class W and PFC D returned to PFC W’s room and found the condom on the floor. Approximately fifteen minutes later, PFC S returned to the barracks. She was told of the incident and immediately called the military police.
Private First Class W made a sworn statement that morning to Criminal Investigation Command Special Agent J [hereinafter Agent J] stating that she did not know the man who allegedly raped her. She also said that there were no lights on in the room. She did state that when she woke up and was looking for her roommate she noticed a person standing outside the window of the room. A few days later, she made another statement to Agent J that she had met the appellant “down range” briefly about four days before the incident. The appellant came to her table and called her “baby.” She objected to that and the appellant tried to apologize.
She made a third statement to Agent J that she believed the overhead lights were on in her room when she awoke the morning of the incident. Agent J then advised her of her rights for making false official statements.
The appellant testified that he had met PFC W a number of times in bars and clubs “down range.” According to the appellant, they had met “down range” the previous Saturday evening, 20 July 1991, danced, drank, and returned to PFC W’s room to have sexual intercourse. They then met during the week and agreed to see each other the following weekend. They met for lunch on Saturday afternoon, 27 July 1991, at the Gateway Club, from approximately 1400 to 1530 hours. The appellant testified that PFC W was in civilian clothes for their lunch date and they agreed to meet later that night.
The appellant testified that he signed out of his unit about 2100 hours, 27 July 1991. The sign-out log, identified by the appellant’s first sergeant, showed that the appellant had signed out at 2335 hours. When asked about this discrepancy, the appellant stated that he must have made a mistake in signing out since he knew he left about 2100. hours. About 2100 hours that evening, he saw PFC W at a club “down range” and they agreed to meet at 0130 hours at the bus stop in front of the Second to None Club on Camp Casey. They met as scheduled and went to PFC Ws room.
In the room, they talked for a few minutes and he told her that he had to return to his unit to sign-in. She told him to call in. The appellant and PFC W went to a phone in the hall and he called the Charge of Quarters (CQ) asking the CQ to sign him in. The CQ testified that he received a call from the appellant to sign him in. The appellant told him he was at the DISCOM barracks with a friend. The CQ could hear a female laughing in the background.
According to the appellant, he and PFC W returned to her room and they had consensu *893 al sexual intercourse. Private First Class W asked him to wear a condom and he did. After they finished the act of sexual intercourse, he removed the condom and gave it to PFC W. At about 0300 hours, the appellant and PFC W were laying on her bed talking when SPC L, the boyfriend, entered the room. Private First Class W told the boyfriend she did not know the appellant or what he was doing in her room. The appellant picked his clothes off the floor, inadvertently picking up PFC W’s panties, and left. The panties were later found in his wall locker. He did not speak to SPC L, nor did they have any physical encounter.
The appellant testified that there were two pictures in a double frame on a night table sitting in the middle of PFC Ws room. One of the pictures is of a baby and the other of a male and female. He stated that PFC W told him the pictures were of her nephew and her sister. Private First Class W testified that there are two pictures in a double frame in her room. The frame is kept on her nightstand or on a shelf. However, the nightstand is not located in the middle of the floor but near the wall next to her bed. The pictures are of her baby nephew and a fellow soldier from Advanced Individual Training and the soldier’s boyfriend. Her sister is not in the pictures.
Private First Class S testified that she returned to her room at approximately 0200 to get the room key. Private First Class W opened the door and appeared to be sleepy and groggy. She did not testify as to seeing the appellant in the room. She also testified that the lock to the room was difficult to lock and did not lock at times. She thought she had locked the door when she departed after obtaining the key but the door may not have locked. She returned at approximately 0400 and was told of the rape. She called the military police.
Private First Class S also testified that she had seen the appellant in the latrine of the female barracks on the weekend of 20 July 1991. Since there was trouble with males in the female barracks, she asked him what he was doing there. He told her he was knocking on doors looking for “Brenda.” Private First Class S told him to leave the barracks. Private First Class Brenda J testified that the appellant came to her room three times prior to the incident with PFC W. He asked if he could see her. She told him no and not to come back.
Private First Class Ws supervisor, SPC E, testified that PFC W worked all day on 27 July 1991 and never left the dining facility. Private First Class Ws duties, as shown on the crew schedule, required her to be in the facility for the entire shift. If PFC W had been gone for any period of time, either SPC E or the noncommissioned officer (NCO) in charge would have missed her.
Four of the appellant’s friends testified that they had seen the appellant and PFC W together before the weekend of 27 July 1991. Sergeant T saw them together on the weekend of 20 July 1991. Privates H and T testified that they saw them together between 1300 and 1600 at or near the Gateway Club on 27 July 1991. Private A testified that he saw the appellant and PFC W together in a club “down range” about 2100 hours on the evening of 27 July 1991. Four NCO supervisors of the appellant testified that in their opinion he was a truthful person.
Specialist L testified that he returned with PFC W to her room about 0100 hours on the evening of 27/28 July 1991. They had consensual sexual intercourse and he left about 0150 hours. He never returned to her room that evening. He left her room because of the division policy that males could not be in the female barracks after 0200 hours.
Specialist W testified for the defense in surrebuttal that he was the individual that PFC W saw standing outside her window on the night of 27 July 1991. He was walking towards his unit when he saw the appellant walking ahead of him and meet a female at the Second to None bus stop. He was a friend of the appellant’s and thought that they could walk to their unit together. He followed the appellant and the female and saw them enter a barracks in the DISCOM area. He did not know what room they entered but did see a light come on in a room. He went to that room and heard the appellant and a female. He went to the window of that room but could not see into *894 the room because there was a curtain on the window. He decided to wait for the appellant and went out front and sat on a stoop. He waited approximately twenty minutes and then went back to the window to see if he could talk to the appellant. He thought the two people in the room were engaged in an act of sexual intercourse because he could hear what he believed to be sounds of sexual intercourse from the room. He heard the female say there was someone at the window so he left and went around the building. He came back about two minutes later and heard a male enter the room and the female say that she did not know the person and had never seen him. When someone mentioned calling the military police, he left and went back to his barracks.
The facts of this case are carefully set out to show the difficulty the trier of fact and this court face in sifting through the competing stories to determine the truth. The issue is to find the facts based on a determination of the credibility of the witnesses. The offense of rape requires an act of sexual intercourse by force and without consent. Manual for Courts-Martial, United States, 1984, Part IV, para. 45c(l)(b); United States v. Williamson, 24 M.J. 32 (C.M.A.1987). If the appellant is believed, then he must be acquitted for there was consent, even though PFC W may have regretted her actions when discovered by her boyfriend. United States v. Bonano-Torres, 31 M.J. 175 (C.M.A.1990). If PFC W is believed beyond a reasonable doubt, the appellant is guilty of rape because a sleeping female cannot consent to sexual intercourse. United States v. Palmer, 33 M.J. 7, 9 (C.M.A.1991) (and cases cited therein).
The court members deliberated for approximately two and a half hours and asked to rehear the testimony of PFC W and the appellant concerning the pictures in PFC W’s room. They resolved the credibility question against the appellant. It is now this court’s requirement to determine credibility.
This court has an exceptional and unique fact-finding authority. It is directed to:
[A]ffirm only such findings of guilty ... as it finds correct in law and fact and determines, on the basis of the whole record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witness.
UCMJ art. 66(c), 10 U.S.C. § 866(c). Case law establishes the standard for determining factual sufficiency as this court being convinced of the guilt of the appellant beyond a reasonable doubt after weighing the evidence of record and making allowances for not having personally observed the witness. United States v. Turner, 25 M.J. 324 (C.M.A.1987). Both the statute and case law require us to consider that the trier of fact heard and observed the witnesses. The government urges us to defer to the credibility determination made by the original trier of fact or to at least give that determination great weight and deference. If the legislative authority or our superior court wanted this court to do more than consider the trier of fact’s observation of the witnesses, they would have articulated a higher standard. We are directed merely to consider that the trier of fact observed and heard the witnesses. Since we must make our own determination of credibility, we will not defer to the findings on credibility by the trier of fact. We will consider their credibility determination after observing the witnesses as a factor in our independent determination of credibility.
We also resolve the credibility determination against the appellant. We find his testimony, except for the fact of sexual intercourse with PFC W, is not credible. There are three major factors that lead us to this determination. First, we find the appellant’s story concerning his meeting PFC W for lunch on the afternoon of 27 July 1991 as not credible. If we were to believe the appellant, we would have to find that PFC W was absent from the dining facility for a number of hours in order to change from her duty uniform to civilian clothes, have an extended lunch with appellant, change back into her duty uniform, and return to work. We find from the testimony of SPC E that PFC W never left the dining facility for any period of time on 27 July 1991. Therefore, the testi *895 mony of the two defense witnesses that they saw PFC W and the appellant together eating lunch that day is also not credible. Secondly, we find the testimony of the appellant that he met PFC W at 2100 hours the evening of 27 July 1991 is not believable. The unit sign-out log shows that the appellant did not sign-out until 2335’ hours. There is a significant difference between 2100 and 2335 such that a person would not make that big a mistake in time through mere inadvertence or inattention. Also, 2335 rather than 2100 is precise in the way a soldier would sign-out. The testimony of the appellant’s two friends that they saw the appellant and PFC W together at 2100 hours is also not believable. Thirdly, PFC Ws boyfriend testified he did not return to her room after he left to satisfy the 0200 policy. Since he left to abide by the policy, it is unlikely that he would just return an hour later for no reason in violation of the policy. We find this more credible than the appellant’s story.
Additionally, SPC L was in the room with PFC W until 0150, therefore she could not have met the appellant at the bus stop at 0130. Private First Class S was in the room at approximately 0200 and PFC W was groggy and appeared to have been asleep. She did not appear to be entertaining a male companion. Private First Class S did not mention that the appellant was present in the room, as he alleged. It is also unlikely that SPC L and the appellant would not at least have spoken, if not come to blows, when SPC L walked in on his girlfriend and the appellant naked in the room.
We also find the testimony of SPC W is not credible. To have followed behind a friend to a barracks, peeped in a window, sat and waited for twenty minutes, and then peeped in the window again is not believable.
The testimony concerning the picture seemed to have caused the trier of fact difficulty because they asked to rehear the testimony on this point. This does not give us pause. The appellant was in PFC Ws room and undoubtedly saw the pictures. One picture was of a baby and the other of a female and a male. It is not an unreasonable guess to say one is of the victim’s sister and the other of the sister’s baby. The only part the appellant got right was that the baby was PFC Ws nephew.
Counsel argues that the appellant did not act like someone that had committed rape when he left PFC Ws room and returned to his barracks. They also note that PFC W’s actions were not like those of someone that had been raped, but more like someone that has engaged in consensual sexual intercourse. We have not been shown any evidence of how a rapist or a rape victim should act. People react to similar circumstances in different ways. See United, States v. Boyd, 1994 WL 59470 (A.F.C.M.R. 25 Feb. 1994) (Snyder, S.J., concurring).
We note that PFC W made prior consistent and inconsistent statements and was advised by Agent J against making false official statements. This does not undermine our finding that her testimony is credible. We find the testimony of the prosecution witnesses, especially PFC W, PFC S, and SPC L as credible. We find the testimony of the defense witnesses, except for the criminal investigator and the four NCOs testifying on their opinion of the truthfulness of the appellant, as not credible. Accordingly, we are convinced beyond a reasonable doubt of the accused’s guilt.
The findings of guilty and the sentence are affirmed.
Judge MORGAN and Judge GONZALES concur.

. The appellant framed the error as the legal and factual sufficiency of the evidence. However, he only argues the factual sufficiency of the evidence. In oral argument, the appellant’s counsel conceded that the only issue was factual sufficiency and that legal sufficiency was not at issue. However, we have reviewed the evidence for legal sufficiency based on Jackson v. Virginia, 443 U.S. 307. 319. 99 S.Ct. 2781. 2789. 61 L.Ed.2d 560 (1979), and hold that the evidence is legally sufficient to support the findings of guilty.

. This is a term used by the soldiers of the Second Infantry Division to describe the bars and clubs in the local Korean town, TongDu-Chon, outside the gates of Camp Casey.

. The criminal investigator assigned to the case, Sergeant J, a female, stated that when she saw PFC W early in the morning of 28 July 1991, she had what appeared to be a “hickey” on her neck.