**UNITED STATES, Appellee,**

v.

**Specialist James E. MORGAN, Jr., United States Army, Appellant.**

**ARMY 9502179.**

U.S. Army Court of Criminal Appeals.

9 Dec. 1997.

For Appellant: Colonel John T. Phelps II, JA; Lieutenant Colonel Michael L. Walters, JA; Major Leslie A. Nepper, JA; Captain John M. Head, JA (on brief); Captain Patricia A. Lewis, JA.

For Appellee: Colonel Joseph E. Ross, JA; Lieutenant Colonel Frederic L. Borch III,

JA; Captain Elizabeth N. Porras, JA; Captain Robert F. Resnick, JA (on brief).

Before EDWARDS, KAPLAN, and CAIRNS, Appellate Military Judges.

## OPINION OF THE COURT

CAIRNS, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of maiming his son by burning him with scalding hot water on the groin and buttocks, in violation of Article 124, Uniform Code of Military Justice, 10 U.S.C. § 924 (1988)[hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge, confinement for one year, and reduction to Private E1.

The appellant asserts that the evidence is legally and factually insufficient to support his conviction on two grounds: first, it fails to prove he intended to injure his child; and, second, it does not show that the victim suffered the extent of disfigurement required by the statute. We disagree and affirm.

## FACTS

While the appellant's wife was away from their home one Saturday, the appellant prepared to bathe his seven-month old son by placing the baby in a portable plastic baby wash tub. He placed the baby tub inside the permanently-installed bathtub, and with the drain open, he turned on the hot water so that it ran into the bathtub without touching the infant or filling the baby's wash container. The appellant left the baby so situated in the bathtub in order to answer the telephone, but the caller hung up before the appellant could pick up the receiver. When he returned to the bathroom, the appellant stuck a plastic Cool Whip container under the running hot water and poured it on his son. After a brief moment in which the baby gasped for breath, the appellant's son cried out in obvious pain. The appellant removed his son from the water and while drying him off, noticed that the baby's groin and buttocks areas were red and "some skin was

coming off." He treated the wounds with Desitin ointment and diapered the child.

Although the appellant did not seek medical treatment or advice, he checked the wounds throughout the day. The appellant and his baby attended a gathering of a theater group, during which the baby was noticeably fussy. When a friend offered to change the baby's diaper, appellant declined the offer and instead changed the baby at considerable distance away from the rest of the group. Later, after the appellant picked up his wife some six hours after the burn was inflicted, he told her what happened but stated that the burn was "not as bad as it looks." The appellant's wife examined her son, became hysterical, and immediately took the baby to the emergency room.

The emergency room physician described the burns as "red, beefy, well-demarcated," of the type indicating scalding by dipping rather than splashing. The burns extended in a diaper-type distribution from below the abdomen in the front to mid-way up the buttocks. The penis and parts of the scrotum were burned, but the anus was not. Photographs taken at the emergency room depict not only red, raw, bleeding burns to the areas as described by the doctor, but they also reveal stark depigmentation and loss of skin on the affected areas of this medium-complexioned, African–American baby. During the baby's nine days of hospitalization, he was attended by the Chief of Pediatrics, Tripler Army Medical Center, who was qualified at trial as an expert in Pediatric Rheumatology, the study of children's muscular-skeleton conditions, including those affecting the skin. In the pediatrician's opinion, the child suffered primarily second-degree burns, with two tiny areas of third-degree burns. After examining the child eight months after the injury, the doctor testified that he believed the loss of skin color in the area of the burn was permanent. On cross-examination, he testified that the depigmented area amounted to five percent of the skin area, and that as the child grows into adulthood, the percentage will decline because that part of the body becomes proportionally smaller.

During the two days following the incident, the appellant was interviewed twice and rendered two sworn, written statements to Criminal Investigation Command (CID) investigators. In his first statement, the appellant said that he did not realize how hot the water was when he poured it on his son. He "could have sworn" he had turned on the cold water faucet as well as the hot. He attributed this oversight to having "something on [his] mind" and not "really paying attention." The appellant specifically denied burning his son on purpose. In his second written statement, the appellant admitted knowing the water was too hot because he saw steam rising from the water. Although he admitted to "deliberately" pouring the hot water on his son "without thinking," he denied any intent to harm his son. He explained why he poured the hot water on his son by stating, "I did it out of frustration and things that were going wrong in my life and marriage." Finally, he admitted that "I thought it might hurt him, but I had so many other things on my mind. . . ."

The CID agent who conducted the second interview testified that the appellant initially maintained his story that the burns were accidental. During the interview, however, the appellant:

> . . . admitted to deliberately pouring the water on his child. That he knew the water was hot before he poured the water on his child. And that he knew that the water that he was going to pour would cause severe burns. He did this out of frustration, as he told me. He told me that he was angry at his wife and at life in general. And, that's the reason he did it. He also told me that he knew what he was about to do, or what he was doing, was wrong.[1]

At trial, the appellant testified that he did not intend to burn or hurt his son. In explaining the scalding as an accident, the appellant attributed his inattentiveness in bathing his son to serious financial problems, arguments with his wife, and other "de-

mands." The appellant stated that his financial problems stemmed from the added expenses of a newborn child, the additional costs associated with his recently obtaining custody of his daughter from a previous marriage, and his wife having quit her full-time job several months earlier. His mind was on the telephone call and his hopes that it would be from a person who might solve his financial difficulties. The appellant attempted to explain away his admissions in the second statement to CID as mere acquiescence to leading questions, not "really listening to what [the CID agent] was saying," and not caring about the consequences of his statement but "just wanting to get out of there." When his trial defense counsel asked the appellant about his admitting to seeing the steam coming off the hot water, he responded, "Well, yeah, that's something that I told them. But, to tell you the truth, I really don't remember seeing any steam."

Several CID agents had previously testified about conducting an experiment in the appellant's quarters. They ran the hot water in the tub and measured the temperature at 140 degrees Fahrenheit. Steam rose from the stream of hot water.

## DISCUSSION

The test for legal sufficiency of the evidence is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In applying this test, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. McGinty,* 38 M.J. 131, 132 (C.M.A.1993). "For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," this court is convinced of the appellant's guilt beyond a reasonable

---

1. The appellant's second written statement (summarized in the previous paragraph) contains admissions regarding his intent which are less inculpatory than those admissions appellant related orally to the CID agent. The CID agent attributed the less-incriminating, written version of appellant's admissions to the imprecision of another CID agent who actually reduced the statement to writing.

doubt. UCMJ art. 66(c), 10 U.S.C.A. § 866(c); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). Both the statute and case law require us to consider that the factfinders heard and observed the witnesses, and made credibility determinations. *United States v. Irvinspence*, 39 M.J. 893, 896 (A.C.M.R.1994).

As set forth in the Manual for Courts–Martial, United States, (1995 edition) [hereinafter MCM, 1995], Part IV, para. 50b, the elements of maiming are as follows:

(1) That the accused inflicted a certain injury upon a certain person;

(2) That this injury seriously disfigured the person's body, destroyed or disabled an organ or member, or seriously diminished the person's physical vigor by the injury to an organ or member; and

(3) That the accused inflicted this injury with the intent to cause some injury to a person.

The appellant does not contest that he inflicted the injuries sustained by his son. The issues concern elements two and three—the extent of injury and intent elements.

### a. Intent to Cause Some Injury

The evidence was more than sufficient for a reasonable factfinder to conclude beyond a reasonable doubt that appellant intended to injure his child. Similarly, having carefully weighed the evidence of record, and making allowances for not having personally observed the witnesses, we ourselves are convinced beyond a reasonable doubt of appellant's intent. The appellant's admissions on this issue are compelling and corroborated. The appellant admitted seeing steam rising from the hot water that burned his son. Two CID agents testified to seeing steam rising from the hot water coming from appellant's bathtub faucet during an experiment after the incident. Knowing that the water was hot enough to emit steam raises a strong inference that appellant knew the water would burn and cause injury to his seven-month-old baby. Such knowledge, coupled with the appellant's acts, are probative of his intent. We need not rely only on inferences, however, because the appellant further admitted that he knew the hot water would cause severe burns and that it was wrong. The appellant explained that he deliberately poured hot water on his son out of frustration with things going wrong in his marriage and life. These admissions are consistent with statements the appellant made to a social worker that he saw steam and had "lost control." Although appellant attempted at trial to explain away the admissions as inaccurate for various reasons, we find his explanations unworthy of belief in view of the totality of the evidence.

### b. Extent of Injury

The appellant contests the legal and factual sufficiency of the evidence to support the second element of maiming, that the injury seriously disfigured his son.[2] The appellant contends that the injury did not amount to "disfigurement," nor was it of a substantially permanent nature as required by the statute.

The Manual for Courts–Martial explains disfigurement as follows:

A disfigurement need not mutilate any entire member to come within the article, or be of any particular type, but must be such as to impair perceptibly and materially the victim's comeliness. The disfigurement ... must be a serious injury of a substantially permanent nature.[3]

The permanent disfigurement supported by the evidence in this case is the depigmentation of appellant's son's body below the abdomen, in the groin area, and midway up his buttocks. The appellant relies on this court's decision in *United States v. McGhee*, 29 M.J. 840 (A.C.M.R.1989), *reversed on other grounds*, 32 M.J. 322 (C.M.A.1991), in which the court found the evidence insufficient to support a conviction of maiming by disfigurement. The victim in

---

2. The second element of maiming includes disfiguring a person by mutilation, or destroying or disabling an organ or member, or seriously diminishing the person's physical vigor by the injury. The government's theory—and military judge's instruction—required the members to find beyond a reasonable doubt that the injury seriously disfigured the infant.

3. MCM, 1995, para. 50c.

648

that case had sustained "some scars" on his face and buttocks. The *McGhee* decision recognizes that to sustain maiming through disfigurement, the evidence must show that the disfigurement impairs perceptibly and materially the victim's comeliness. The court's decision offered the following test for determining whether an injury perceptibly and materially impairs a victim's comeliness: Is the impairment "easily detectable to the casual observer?" Relying on *McGhee,* the appellant contends that since the location of the depigmentation on this victim renders the scars undetectable to all but the most intimate observer, maiming cannot be legally or factually sustained. His argument assumes that *McGhee* holds that scars normally covered in public by clothing do not perceptibly impair the victim's comeliness, and therefore cannot constitute disfigurement within the meaning of the maiming statute. We disagree with appellant's interpretation and application of our precedent.

The *McGhee* decision did not establish a test that excludes from the ambit of maiming impairments or scars that are not "easily detectable to the casual observer" because they are normally covered in public by clothing. On the contrary, the *McGhee* court found from *their* examination of the photographs of the victim's injuries and doctor's testimony *in that case* that the scars were not "easily detectable to the casual observer." Thus, we construe the decision to be one in which the court, exercising it's Article 66 factfinding mandate, was unconvinced factually that the scars were perceptible and material—not because they were on the victim's buttocks, an area usually covered in public by clothing—but because they were not easily detectable when actually viewed. Accordingly, we specifically reject the argument that disfigurements to areas of the body normally covered by clothing are less sustainable as violations of Article 124, Maiming, because clothing interferes with the public's ability to perceive the impaired comeliness of victims. To the extent that some may read *McGhee* as standing for that proposition, we decline to follow that rationale. We conclude that *McGhee* was a factually-based decision and is limited in its application.[4]

We have viewed the photographs admitted in appellant's trial. They depict the injuries sustained on the day of the incident and eight months later. We can clearly see stark depigmentation from about the waist, through the groin area, and mid-way up the buttocks. Our observations are confirmed by the doctor's expert testimony concerning the nature, extent, and anticipated permanent duration of the impairment. The photographs and the testimony of the expert convince us that the scars are substantially permanent. We are satisfied that the scars in this case, though located in an area normally unexposed to the public, perceptibly and materially impair the victim's comeliness. *United States v. Spenhoff,* 41 M.J. 772 (A.F.Ct. Crim.App.1995). We hold, therefore, that the evidence is legally and factually sufficient to support the conclusion that the victim was seriously disfigured.

We have carefully considered the matters personally submitted by appellant under *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge EDWARDS and Judge KAPLAN concur.

---

4. See *United States v. Outin,* 42 M.J. 603 (N.M.Ct.Crim.App.1995).