UNITED STATES, Appellee,

v.

Specialist Kenneth L. PIERCE,
253–29–2325, United States
Army, Appellant.

ACMR 9202428.

U.S. Army Court of Military Review.

8 June 1994.

For Appellant: Captain Silas R. DeRoma, JAGC (argued); Major Michael A. Egan, JAGC (on brief).

For Appellee: Captain Gregory T. Baldwin, JAGC, Captain Joel B. Miller, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Major James L. Pohl, JAGC (on brief).

OPINION OF THE COURT ON MOTION
FOR RECONSIDERATION EN
BANC

CREAN, Senior Judge:

Contrary to his pleas, the appellant was convicted by a military judge sitting as a general court-martial of rape, in violation of Article 120, Uniform Code of Military Jus-

tice, 10 U.S.C. § 920 (1988) [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a dishonorable discharge, confinement for four years, forfeiture of all pay and allowances, and reduction to Private E1.

In a unanimous opinion dated 10 December 1993, and served on counsel 3 January 1994, a panel of this court set aside the findings and sentence because of factual insufficiency and dismissed the charge. On 24 January 1994, appellate government counsel moved for reconsideration en banc of the panel's decision. On 7 February 1994, this court decided that it would reconsider the case en banc and issued an order granting the request for reconsideration. On 17 February 1994, the court issued a second order specifying the issues to be briefed and argued by counsel.[1] Oral argument was heard on 22 April 1994.[2]

During the court's deliberations on Specified Issue I, we determined that the question of whether the court *should* exercise its authority to reconsider the decision of the panel had also been raised. This court holds that we have the authority to consider en banc the panel's decision. However, we are split as to whether we should exercise that authority in this case.[3] Since a majority of the judges are not in favor of en banc reconsideration, we now conclude that the request for reconsideration en banc was improvidently granted and return the case to the original panel.[4]

## I. Authority For En Banc Reconsideration

The Courts of Military Review originally did not have the authority to reconsider a panel's decision en banc. *United States v. Wheeler,* 20 U.S.C.M.A. 595, 44 C.M.R. 25, 1971 WL 12437 (1971); *United States v. Chilcote,* 20 U.S.C.M.A. 283, 43 C.M.R. 123, 1971 WL 12735 (1971). To overcome these prece-

---

1. The court ordered oral argument on the following five specified issues:

I.
WHETHER THE COURT OF MILITARY REVIEW SITTING AS A WHOLE HAS THE AUTHORITY UNDER ARTICLE 66(a), UNIFORM CODE OF MILITARY JUSTICE, 10 U.S.C. § 866(a), TO RECONSIDER A FINDING BY THE COURT SITTING AS A PANEL THAT THE EVIDENCE OF RECORD WAS FACTUALLY INSUFFICIENT TO SUSTAIN A CONVICTION. *See United States v. Flowers,* 26 M.J. 463, 466 (C.M.A.1988) (Everett, C.J., concurring in result) and *United States v. Turner,* 25 M.J. 324 (C.M.A.1987).

II.
WHETHER THE EVIDENCE OF RECORD WAS LEGALLY AND FACTUALLY SUFFICIENT TO PROVE THE ELEMENT OF FORCE AND LACK OF CONSENT FOR RAPE.

III.
WHETHER THE APPELLANT, WHO REFRAINED FROM TESTIFYING AT TRIAL, RAISED THE MISTAKE OF FACT DEFENSE TO THE CHARGE OF RAPE.

IV.
ASSUMING ARGUENDO THAT THE FACTS ARE INSUFFICIENT TO SUSTAIN THE FINDINGS OF GUILTY FOR RAPE, WHETHER EVIDENCE WAS PRESENTED AT TRIAL SUFFICIENT TO SUPPORT A FINDING OF GUILTY FOR ANY LESSER INCLUDED OFFENSES.

V.
WHETHER THE APPELLANT REMAINS PROPERLY IN CONFINEMENT, IN LIGHT OF THE FINDING OF THE COURT SITTING AS A PANEL THAT THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE FINDINGS OF GUILT.

2. On 21 March 1994, the appellant petitioned the United States Court of Military Appeals for a writ of habeas corpus, seeking his immediate release from confinement, for review of this court's order granting en banc reconsideration of his case, vacation of this court's order granting reconsideration, and prohibiting this court from reconsidering his case en banc. *Pierce v. Lowe,* 39 M.J. 435 (C.M.A.1994). On 5 April 1994, the United States Court of Military Appeals denied the appellant's petition "without prejudice to the petitioner's right to raise the issues asserted in the petition for extraordinary relief before the United States Army Court of Military Review." *Pierce v. Lowe,* USCMA MISC. 94–8101/AR 40 M.J. 11 (C.M.A.1994) (order).

3. Judge Russell and I are joined in the decision not to reconsider en banc the three-judge panel's decision. Judge Russell and I decide only the narrow issue of en banc consideration and take no position on whether we would have decided the case the same way that the original panel decided the case. It should be perfectly clear that since the case is not before the court for consideration, Judge Russell and I do not decide the issue of the factual sufficiency of the evidence.

4. On 22 April 1994, the court ordered that the appellant be released from confinement pending a written opinion of the court. The appellant was released from confinement at the United States Disciplinary Barracks, Fort Leavenworth, Kansas, on the afternoon of 22 April 1994.

dents,[5] Article 66(a), UCMJ, was amended by adding the sentence, "[a]ny decision of a panel may be reconsidered by the court sitting as a whole in accordance with such rules."[6] Pub.L. No. 98–209, § 7(b), 97 Stat. 1402 (1983). This authority was upheld by the United States Court of Military Appeals. *United States v. Flowers,* 26 M.J. 463 (C.M.A.1988). Chief Judge Everett, in his concurring opinion in *Flowers,* expressed the narrow interpretation that the purpose for the change to Article 66(a), UCMJ, was to resolve differences as to legal issues and that the Courts of Military Review do not have the power to reconsider en banc a factual finding or a determination of sentence appropriateness. *Flowers,* 26 M.J. at 466 (Everett, C.J., concurring). However, we find little in the legislative history of the Military Justice Act of 1983, including the statement and testimony of Chief Judge Everett, that mentions limiting en banc consideration to only legal matters. We find nothing that would modify the plain meaning of the words of the statute that "any" decision of the court can be considered en banc. Accordingly, we hold that a Court of Military Review has the power to reconsider any of its decisions en banc.

Judge Johnston, in his concurring opinion, finds that the authority for en banc consideration in Article 66, UCMJ, is limited by the legislative history of that statutory authority to consideration of legal issues only. We disagree with this view. The issue that was considered by Congress in the 1949 hearings promulgating the Uniform Code concerned the authority of The Judge Advocate General to send a case to a Board of Review because he did not like an opinion rendered in that case by a different Board of Review. At the time, each Board of Review was separate and there was not one Board of Review that heard cases by panels. The issue considered by Congress in 1983 to give the Courts of Military Review authority to reconsider any decision of one of its panels is a difference in kind and not a difference in degree from the 1949 issue. By 1983, there was only one Court of Military Review for each military service and that court sat in panels. The 1983 amendment to Article 66(c), UCMJ, dealt with the court as a whole exercising discretion and not with The Judge Advocate General ordering a different board to consider an action taken by another board.

II. Exercise of En Banc Authority

Article 66(a), UCMJ, provides in pertinent part:

> Each Judge Advocate General shall establish a Court of Military Review which shall be composed of one or more panels, and each such panel shall be composed of not less than three appellate military judges. For the purpose of reviewing court-martial cases, the court may sit in panels or as a whole in accordance with rules prescribed under subsection (f). Any decision of a panel may be reconsidered by the court sitting as a whole in accordance with such rules.

Article 66(f), UCMJ, provides: "The Judge Advocates General shall prescribe uniform rules of procedure for Courts of Military Review and shall meet periodically to formulate policies and procedure in regard to review of court-martial cases ... by Courts of Military Review."

Pursuant to the authority and mandate of Article 66(f), UCMJ, The Judge Advocates General established, on 1 March 1985, the Joint Court of Military Review Rules [hereinafter C.M.R.R.].[7]

En banc proceedings are provided for in C.M.R. R. 17:

> A majority of the judges present for duty may order that *any appeal* or other proceeding be considered or reconsidered, except as indicated in section (c) below [not pertinent to this case], by the Court sitting as a whole. Such consideration or reconsideration ordinarily will not be ordered except (1) when consideration by the full

---

5. Military Justice Act of 1983, S.Rep. No. 53, 98th Cong., 1st Sess. 28 (1983), *reprinted in* Index and Legislative History: Uniform Code of Military Justice 1983, at 555 (1983).

6. The rules referred to were those uniform rules prescribed by The Judge Advocates General in accordance with Article 66(f), UCMJ.

7. These rules are published in 22 M.J. at CXXVII.

Court is necessary to secure or maintain uniformity of decision, or (2) when the proceedings involve a question of exceptional importance, or (3) when a sentence being reviewed pursuant to Article 66 extends to death.

C.M.R. R. 17(a) (emphasis added).

The Chief Judge, United States Army Court of Military Review, under authority of C.M.R. R. 26, has promulgated internal rules for the Army Court of Military Review [hereinafter A.C.M.R. R.]. Rule 19.1 concerns reconsideration, including reconsideration en banc, and states in pertinent part:

(b) Reconsideration ordinarily will not be granted except upon a showing that one of the following grounds exists:

(1) A material legal or factual matter was overlooked or misapplied in the decision;

(2) A change in the law occurring after the case was submitted was overlooked or misapplied by the Court;

(3) The decision conflicts with a decision of the Supreme Court of the United States, the United States Court of Military Appeals, or this Court.

A.C.M.R. R. 19.1(b).

The United States Supreme Court considers en banc proceedings to be the exception rather than the rule and that en banc proceedings should be convened only when extraordinary circumstances exist that call for authoritative consideration and decision. *United States v. American–Foreign Steamship Corp.,* 363 U.S. 685, 689, 80 S.Ct. 1336, 1339, 4 L.Ed.2d 1491 (1960). In the Federal Circuit Courts of Appeal, en banc proceedings are not favored and not ordinarily granted unless necessary to secure or maintain uniformity of circuit decisions, or the issue involves a question of exceptional importance. Federal Rule of Appellate Procedure 35. Joint Rule 17 is taken almost verbatim from the federal rule.

■ We hold that our standards for determining if a case should be heard en banc are ordinarily those three specified in C.M.R. R. 17: (1) necessary to maintain uniformity within the panels, (2) the case is a death penalty case, or (3) the issue is a matter of exceptional importance. In deciding if a matter is of exceptional importance or if decisions of the panels are uniform, we will consider the reasons specified in A.C.M.R. R. 19.1. Based on these standards, the requests for this court to consider en banc a panel's decision should be very rare. This court, as a whole, does not sit as an intermediate appellate court between the panels and the Court of Military Appeals. In submitting a suggestion for consideration en banc, counsel should specify, pursuant to C.M.R. R. 17, the reasons why the case should be considered by the court as a whole.

First, this is not a death penalty case. Second, as a case decided on factual sufficiency grounds, it is fact specific and therefore, by definition, need not achieve uniformity with other cases. Inasmuch as the first two situations listed in C.M.R. R. 17 are not present in this case, we are left to consider whether this is a case of exceptional importance.

■ This case is not a case of exceptional importance. The rape of one soldier by another soldier from the same unit in the barracks is serious criminal misconduct that is extremely harmful to the victim and highly prejudicial to good order and discipline. However "exceptional importance" for purposes of identifying those cases that require en banc consideration derives from the enduring significance of the legal issues raised by the case, *not* from victim impact or the seriousness of the charge. So-called "date" or "acquaintance" rape does not differ in a legal perspective from any other alleged rape. The question for courts has always been, and continues to be, whether the factual circumstances prove rape beyond a reasonable doubt. Thus, inasmuch as this case was decided on the basis of factual sufficiency, it has no precedential value. Moreover, the time-honored legal standards applicable to the analysis of rape are well understood and perfectly suitable to resolve the issue at hand.

The legal standards for rape under circumstances similar to this case are set forth in numerous precedents and were applied by

the panel in rendering its decision.[8] *See United States v. Moore,* 5 C.M.R. 438, 1952 WL 2177 (A.F.B.R.1952); *United States v. Kernan,* 11 C.M.R. 314, 1953 WL 2032 (A.B.R.1953); *United States v. Robertson,* 33 C.M.R. 828, 1963 WL 4957 (A.F.B.R.1963); *United States v. Stegar,* 16 U.S.C.M.A. 569, 37 C.M.R. 189, 1967 WL 4218 (1967); *United States v. Ruggiero,* 1 M.J. 1089 (N.C.M.R. 1977), *pet. denied,* 3 M.J. 117 (C.M.A.1977); *United States v. Allen,* 3 M.J. 986 (A.C.M.R. 1977), *aff'd,* 7 M.J. 345 (C.M.A.1979); *United States v. Steward,* 18 M.J. 506 (A.F.C.M.R. 1984).

In recent years with the influx of more women in the Armed Forces, the cases of "date" or "acquaintance" rape have been more frequent, but the issues are still the same. *United States v. Houser,* 36 M.J. 392 (C.M.A.1993), *cert. denied,* — U.S. —, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993); *United States v. Polk,* 32 M.J. 150 (C.M.A.1991); *United States v. Bonano–Torres,* 31 M.J. 175 (C.M.A.1990); *United States v. Reynolds,* 29 M.J. 105 (C.M.A.1989); *United States v. Barboza,* 39 M.J. 596 (A.C.M.R.1994); *United States v. Webster,* 37 M.J. 670 (C.G.C.M.R. 1993); *United States v. Carroll,* 30 M.J. 598 (C.G.C.M.R.1990).

The increase in the number of rape cases is a matter of great concern to the leadership and command of the Army. The criminality of the acts, on a case-by-case basis, is the concern of this court. The issues of criminality have not changed or increased. This case neither adds nor subtracts anything from this body of law. It does not involve a question of military jurisprudence of first impression that is likely to recur. This issue will not cause great concern within the military legal community if not resolved by an authoritative directive from this court. It is not a case, therefore, of exceptional importance.

This case will have little, if any, effect on the Armed Forces. It will not, any more than the cases cited above, affect the conduct of male and female soldiers in the barracks.

It will not affect the decision making of commanders .in dealing with conduct between male and female soldiers.

The judges who would hear this case en banc want to do so because they believe that the case was wrongly decided by the original panel. In other words, they wish to substitute their judgment, as fact finders, for that of the panel. The basic tenor of their opinion is that the panel's decision is wrong and a wrong decision affects the Armed Forces, and is therefore, a matter of extreme importance. Their opinion would create a fourth ground for en banc reconsideration, that is, if a panel opinion may be wrong, it should be reconsidered by the court as a whole. Their view would place the court, sitting as a whole, as an intermediate appellate court between the panels and the Court of Military Appeals. Counsel for the party not prevailing in a panel decision would be within their right to ask for en banc reconsideration of almost any case by arguing that the panel opinion is wrong and if that wrong opinion goes out it will be a matter of extreme importance to the armed service. If we followed the dissenters' logic, this court, as any appellate court, would become bogged down in consideration of en banc petitions and would become totally ineffective.

The motion for reconsideration en banc is not adopted. The case is returned to the original panel for such action as it deems appropriate.

Senior Judge GRAVELLE and Judge BAKER concur.

RUSSELL, Judge, concurring:

I concur with the lead opinion. I write separately only to share my disagreement with the dissenters' view that the lead opinion suggests that a "clearly erroneous" reversal of a rape conviction is not an "exceptional" case warranting en banc review.

8. The normal sequence of citing cases is the superior court first in chronological order starting with the most recent decision followed by cases of the inferior courts in the same chrono-logical order. These cases are cited in chronological order from the oldest to the newest to emphasize the development of the law on the area of "rape".

## I.

Issues surrounding sexual conduct by male and female soldiers living together in the barracks evoke strong emotions. The "acquaintance rape" debate has begun to change popular perception regarding the criminalization of all nonconsensual intercourse as rape. Some have determined what a politically correct result should be. Unfortunately, Congress has not acted to change Article 120, UCMJ.

The current law, with its harsh effects on the efficacy of rape convictions, remains the same for us as it has been for a long time. Article 120, UCMJ, embodies the tough standards of proof explained by the Court of Military Appeals forty years ago: "The mere nonconsent of a female to intercourse where she is in possession of her natural, mental, and physical powers, is not overcome by numbers or terrified by threats, or in such place and position that resistance would be useless does not constitute the crime of rape on the part of the man who has connection with her under such circumstances." *United States v. Short*, 4 U.S.C.M.A. 437, 16 C.M.R. 11, 16, 1954 WL 2421 (C.M.A.1954) (citing *Mills v. United States*, 164 U.S. 644, 17 S.Ct. 210, 41 L.Ed. 584 (1897)). In other words, where the doctrine of constructive force does not apply, evidence of a lack of consent alone, without evidence of those measures of resistance reasonably called for under the circumstances, establishes at law no more than the victim's acquiescence and as such does not constitute the crime of rape.[1] *Mills*, 164 U.S. at 648, 17 S.Ct. at 211.

Thus, a prosecutor hefts a particularly heavy burden where the evidence discloses a fully competent "victim" who offers only light or token resistance and who suffers no physical injury whatsoever. The prosecutor in such a case has few facts sufficient to prove lack of consent, that lack of consent was made reasonably manifest, or that actual force sufficient to overcome her will *and* capacity to resist was brought to bear in order to achieve penetration. *United States v. Bonano–Torres*, 29 M.J. 845, 850 (A.C.M.R.1989); *United States v. Clark*, 35 M.J. 432 (C.M.A.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1948, 123 L.Ed.2d 653 (1993); *see Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 2868, 53 L.Ed.2d 982 (1977). Most are not satisfied when the facts of these close cases do not meet the legal requirements of Article 120, and a weak prosecution then fails. However, it is the law, not the facts, that dictates the result. If the law should be changed, it is up to the Congress to do so, not this court.

## II.

In deciding whether en banc review is appropriate in this case, I began with the basic premise that a panel's decision in favor of an appellant based solely on factual insufficiency is entitled to great deference from the court as a whole. However, inasmuch as the case resulted in the reversal of a conviction for rape (a very serious violent crime), if the decision is "clearly erroneous" then I believe a matter of "exceptional importance" appropriate for en banc consideration is raised.

This is a case of first impression. There is no standard of review for deciding whether a panel's reasonable doubt determination is "clearly erroneous". Therefore, I devised my own standard for deciding *only* the narrow issue of whether de novo en banc consideration was necessary. I chose to evaluate the panel's finding of reasonable doubt just as we would judge the legal sufficiency of a trial judge's subjective finding of guilty: viewing the evidence in a light most favorable to the party in whose favor the decision was rendered, is there a basis in fact upon which the panel, acting pursuant to the constraints of Article 66, Uniform Code of Military Justice, 10 U.S.C. § 866 (1988) [hereinafter UCMJ], could have found a reasonable doubt concerning the guilt of the accused. *Cf. Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A.1991).

---

1. Such conduct may still constitute an assault and battery, or an indecent assault. However, it is not rape.

### III.

This is clearly a case where judges may differ. That is apparent from the split on this court. It is also apparent from the action of the trial judge, one of the most respected figures on the bench today.[2] He considered the case so close that the defense of mistake of fact was raised even though the appellant did not testify. Moreover, he agreed to reconsider his findings of guilty and then issued specific findings of fact to help us understand how he personally resolved the ambiguities raised by the basic facts.[3] Accepting the prosecutrix's testimony as true, I can still plainly see that the government's rape case, though legally sufficient, is factually weak in several important respects.[4]

Applying the standard described above to the facts of this case, I am satisfied that the panel decision was not clearly erroneous and that the appellant was justly cleared of the charge of rape. I have not assessed whether any lesser included offenses were present in this case. Inasmuch as the rape charge has been disposed of, I am satisfied that consideration of lesser included offenses, should any exist, is not a matter of exceptional importance warranting en banc review.

More importantly, I am satisfied that the original panel decision issued by my brethren was the result of a conscientious exercise of their responsibility under Article 66, to be satisfied *personally* beyond a reasonable doubt that a rape occurred. Applying the correct legal standards in making this individual judgment, they were not so persuaded. Simple justice requires no more.

The dissenters imply that, had they been the ones assigned to weigh the evidence under this court's Article 66 mandate, they would have been personally satisfied that rape was proven beyond a reasonable doubt. However, this case was not assigned to them. I am certain that they do not claim to possess more ability than their brethren to assess whether the totality of the evidence gives rise to a reasonable doubt in their brethren's minds; that would be a rare talent indeed. Moreover, they cannot credibly assert in this close case that no reasonable fact finder could have harbored a reasonable doubt as to whether a rape occurred. Thus, I ask myself, "What good purpose would be served by substituting the judgment of ten good judges for the judgment of three good judges?". I honestly cannot fathom how en banc reconsideration in this case could add anything to the process that would likely enhance the quality of the outcome.

In sum, the fact that interloping judges may disagree with the honest and principled weighing of the evidence by other judges appointed under oath to do so *certainly* does not make the latter's decision "wrong", let alone create an issue of exceptional importance. It is a fact of no consequence that would have been better left unsaid.

JOHNSTON, Judge, concurring in result:

Assuming that this court has the authority under Article 66(a), Uniform Code of Military

---

2. Colonel Howard C. Eggers, JA.

3. In this case, the appellate dispute over whether the preliminary facts are "factually" sufficient to prove the ultimate issues of force, lack of consent, and lack of mistake does not in any way impugn the military judge's determination that the prosecutrix was credible. The panel decision acknowledges that her testimony was credible and in essence, adopts that testimony completely. Moreover, the panel agrees that the facts she provided are sufficient as a matter of law to support the findings of guilty. Thus, the panel decision more than fulfills the Article 66 requirement to "recognize" that the trial court saw and heard the only key witness who testified.

However, Article 66 does not require a panel to defer to the trial judge's individual, subjective selection of one of the permissible inferences to be drawn from the preliminary facts, where that inference resolves an ultimate fact or issue that has only been circumstantially established.

4. For example: (1) there is no unambiguous evidence that the appellant applied actual force to the body of the victim in the minutes following the victim's willing participation in the "french kiss", (2) the victim did not engage in that level of resistance or self-help that was reasonably and safely available to her, and the trial judge so found, (3) the victim was a mature, physically fit soldier who was apparently entirely capable of avoiding unwanted sexual intercourse under the circumstances of this case, (4) the victim was not reasonably in fear of death, bodily harm, or any other significant harm that would explain why she would permit penetration without meaningful resistance or other self-help, and (5) there is no evidence or specific finding that the appellant was bigger or stronger than the victim.

Justice, 10 U.S.C. § 866(a) (1988) [hereinafter UCMJ], to reconsider a decision of the court sitting as a panel, I agree that the unique facts of this case do not involve a "question of exceptional importance" within the meaning of Joint Rule 17(a)(2). I am not convinced, however, that Article 66, UCMJ, confers upon this court as a whole the authority to reconsider a panel decision based on factual insufficiency.[1]

Article 66(a), UCMJ, provides in pertinent part that this court:

> shall be composed of one or more panels, and each such panel shall be composed of not less than three appellate military judges. For the purpose of reviewing court-martial cases, the court may sit in panels or as a whole in accordance with rules prescribed under subsection (f). Any decision of a panel may be reconsidered by the court sitting as a whole in accordance with such rules.

While the plain meaning of the statute seems to indicate that "any decision" of a panel may be reconsidered en banc, the legislative history of Article 66, UCMJ, reveals that this is one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). "In such cases, the intention of the drafters rather than the strict language controls." *United States v. Ron Pair Enterprises, Inc.*,

489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989).

At one time the Court of Military Review had no authority to reconsider en banc a decision rendered by a panel of the court. Conflicts between separate panels of the same Court of Military Review could be resolved only by an appeal to the Court of Military Appeals. This lack of en banc authority for the Court of Military Review was based on deep-seated congressional concerns about the fairness of the military justice appellate process.

These congressional concerns came to light in the 1949 hearings on the UCMJ.[2] Felix Larkin, the civilian official most responsible for drafting and ultimately enacting the UCMJ, outlined the problem for those congressmen considering the legislation.[3]

> Now, there may be a case or there may be cases in which the board of review will reverse not on a question of law but on a construction of the facts or on their idea of the credibility of a witness that is different from the credibility that the court gave that witness.... If two boards of review differ on the law, why it certainly needs settling some place.

> But if they disagree or [The Judge Advocate General] disagrees with a board of review on the facts, why there is no other place for it to go except another board, and it may well be such an extremely important case that [The Judge Advocate Gener-

---

1. Although the majority view arrives at the same point (i.e. a case decided on the basis of a factual insufficiency is not a question of exceptional importance suitable for *en banc* reconsideration), they do so only after the expenditure of considerable judicial resources.

2. The question of reconsideration for panel decisions was hotly debated in 1949. Although those provisions dealt with boards of review, the policy concerns underlying those debates remain constant. The testimony in 1949 of several witnesses still has validity on the question of policy. For example:

   > We believe that this provision [that allows for reconsideration by the same or another board of review] destroys the independence and integrity of boards of review, and that it should be stricken.

   *Uniform Code of Military Justice, 1949: Hearing on H.R. 2498 Before a Subcomm. of the House of Representatives Comm. on Armed Services*, 81st

Cong., 1st Sess. 642 (1949) (statement of Richard H. Wells, Chairman, Special Committee on Military Justice of the New York County Lawyers Association).

   > [I]f the judge advocate general invests in the board of review, particularly when it is composed of a competent board of officers, the authority to pass on a question, you should not have second guessing on it. I think that ought to be final and binding....

   *Id.* at 624 (statement of Frederick P. Bryan, Chairman, Special Committee on Military Justice of the Bar Association of the City of New York).

3. Felix Larkin has been so described by Professor Jonathan Lurie, the historian of the Court of Military Appeals. Remarks, "Appointment of U.S.C.M.A. Judges," Judicial Conference, U.S. Court of Military Appeals, May 12, 1994.

al] would like to have another opinion as to the construction of the facts, the credibility of the witnesses, or the settling of controverted questions of fact.

*Uniform Code of Military Justice, 1949: Hearing on H.R. 2498 Before a Subcomm. of the House of Representatives Comm. on Armed Services,* 81st Cong., 1st Sess. 1191 (1949) (statement of Felix Larkin, Assistant General Counsel, Office of the Secretary of Defense)

After considering the issue, the subcommittee adopted an amendment that would allow the Judge Advocate General only one reconsideration so that factual issues would not be subjected to one review after another. *Id.* at 1194. The next morning, however, the subcommittee reversed itself and deleted the provision allowing reconsideration. *Id.* at 1207. Overton Brooks, the subcommittee chairman, expressed his views as follows:

I personally feel that [reconsideration by another review board] is one part of the bill that we cannot properly defend on the floor of the House. I have thought a good deal about it.

. . . .

If one board decides one way and another one decides the other way, you are going to weaken your whole system of justice. It is not a case where you have a divided court, 2 to 1, but here you have two separate tribunals rendering a decision on the same case, and the decisions may be diametrically opposed to each other. I think that hurts the whole system.

*Id.* at 1201, 1205.

Mr. Elston, who originally offered the amendment to provide for one reconsideration, voted to delete the provision and expressed his reservations about reconsideration:

I thought the section was susceptible of abuse. The thing that disturbed me was the fact that a board of review might say that an accused was innocent. The [Judge Advocate General] would not be satisfied with that decision and would refer it to the next board of review which would affirm a sentence of conviction. That does not seem to be exactly right. . . .

. . . .

I am concerned about a case where a board says that a man is not guilty, the facts in the case do not establish his guilt beyond a reasonable doubt and they feel that the case should be dismissed. Then the Judge Advocate General refers it to another board. They have exactly the same authority and they have exactly the same record in front of them. . . .

. . . .

If they [the first board] are competent men, if the Judge Advocate General selects competent men to serve as members of that board, why should not the decision of the board in the first instance be final?

*Id.* at 1201, 1204.

Although these statements reflecting congressional concern in 1949 were directed at the old board of review system for reviewing courts-martial, in *United States v. Chilcote,* 20 U.S.C.M.A. 283, 43 C.M.R. 123, 1971 WL 12735 (1971), the Court of Military Appeals applied the same standard of congressional intent to the operations of the United States Navy Court of Military Review. The issue in *Chilcote* was whether the disjunctive "or" in statute authorizing a Court of Military Review to "sit in panels or as a whole" excluded a joint rule allowing reconsideration. The court examined the intent of the drafters for Article 66, UCMJ, and characterized it as a "congressional opposition to the reversal of panel decisions favoring the accused."[4] The

---

**4.** The Court of Military Appeals specifically concurred in the "desirability of resolving conflicts *on questions of law* among panels of the same court and of promoting finality of decision within the Courts of Military Review." *Chilcote,* 43 C.M.R. at 127 (emphasis added). They concluded, however, that desirability was insufficient justification to construe the statute in favor of *en banc* reconsideration of panel decisions in the absence of convincing proof that Congress intended such a result.

It should be noted that the quotation from *Chilcote,* less the emphasized portion, is identical to that used in defining the purpose of the statutory change in the legislative history of the 1983 amendment to Article 66(a), UCMJ. *See* S.Rep. No. 98–53, 98th Cong., 1st Sess. 28 (1983). The government contends the 1983 amendment clearly provided for reconsideration of "[a]ny decision" of the court. The words chosen to describe the purpose of the amendment, howev-

court further stated "[i]n this instance we can find not a trace of an intent to reverse the 1950 congressional decision not to permit an overturning of panel determinations of factual questions that were favorable to an accused." *Id.* 43 C.M.R. at 126.[5]

In *United States v. Wheeler,* 20 U.S.C.M.A. 595, 44 C.M.R. 25, 1971 WL 12437 (1971), an Army case, the court again concluded that the statutory language and history of the Military Justice Act of 1968 were not enough to establish a congressional intent to reverse its earlier position against reconsideration of panel decisions in favor of an accused. Consequently the court construed Article 66(a), UCMJ, as meaning that "cases are to be reviewed and decided by panels of the court or by the entire court, but that the same case may not be decided by two different groups of judges within a Court of Military Review." *Id.* 44 C.M.R. at 28.

The statutory language that seems to indicate that panel decisions may be reconsidered en banc was added to Article 66(a), UCMJ, by the Military Justice Act of 1983: "[a]ny decision of a panel may be reconsidered by the court sitting as a whole in accordance with such rules [i.e. Article 66(f) ]." The scope of this legislation, however, is not as broad as might appear at first glance. The legislative history of the provision indicates that the majority of those supporting the change did not interpret it as allowing for reconsideration of factual matters.

The prepared statement of William H. Taft IV, General Counsel of the Department of Defense, before the United States Senate subcommittee studying the legislation indicated that:

> The procedure for consideration by the Courts of Military Review also requires some fine tuning. Under current case law, the Courts of Military Review cannot order a rehearing en banc to resolve disagreements among panels. This leads to unnec-

essary delay in obtaining a clear statement of the law. [This bill] provide[s] statutory authority for such reconsideration.

*The Military Justice Act of 1982, 1982: Hearings on S. 2521 Before the Subcomm. on Manpower and Personnel of the Senate Comm. on Armed Services,* 97th Cong., 2nd Sess. 28 (statement of William H. Taft IV, General Counsel of the Department of Defense).

Chief Judge Everett, and Associate Judges Cook and Fletcher of the Court of Military Appeals also appeared before the subcommittee in support of the legislation authorizing rehearing en banc in the Courts of Military Review. Chief Judge Everett stated:

> We favor reconsideration en banc by courts of military review. This by the way, is another proposal on which there seems to be little controversy. I might note that the American Bar Association has for many years taken a position that this is desirable....
>
> ....
>
> The need for this particular provision, which would authorize Courts of Military Review to do that which is permitted in I think every Federal Court of Appeals, arises from the peculiar wording of the statute....

*Id.* at 97.

The prepared statement from the judges of the Court of Military Appeals continued in a similar vein:

> [This legislation] would authorize Courts of Military Review to consider *en banc* the decisions of their panels. This change, which also has been recommended by the American Bar Association, is desirable, since it would assure greater consistency in the opinions rendered by each Court of Military Review and, in some instances,

er, are identical to those used by the Court of Military Appeals to show their support for *en banc* reconsideration of questions of law.

5. Judge Crean, in his lead opinion in this case, characterizes the thrust of the 1949 legislative history as a limitation on the authority of The Judge Advocates General to order a rehearing.

The Court of Military Appeals apparently disagrees. The legislative intent issue does not concern the relative merits of discretionary reconsideration by the court *en banc* or mandatory reconsideration ordered by a Judge Advocate General. Instead the focus is on reconsideration of questions of fact resolved in favor of an appellant.

would obviate the need to seek review from our Court.

*Id.* at 115.

Support for the legislation from the American Bar Association contained similar language:

> We are also pleased to support the provision included in [the legislation] and endorsed by the Department of Defense to allow rehearings en banc by the Courts of Military Review. Such rehearings would expedite the resolution of conflicts among panels in the military justice system and would promote finality of Court of Review decisions within the respective systems.

*Id.* at 192.

An additional witness from the Committee on Military Justice of the Bar of the City of New York continued the refrain:

> [E]n banc consideration would promote uniformity of appellate interpretation at the court of military review level within each service and it might also reduce the need for consideration of cases by the court of military appeals to resolve conflicts among particular panels of the lower court.

*Id.* at 278.

Significantly, the Senate report concerning the legislation contains no indication of a congressional retreat from the position it debated and resolved in 1949 and reaffirmed in 1968. Congress debated the idea of reconsideration of factual determinations, adopted an amendment to allow reconsideration, and then one day later changed its view and deleted the provision which would have allowed reconsideration of factual determinations. Similar debate and discussion was not conducted in 1983 that would indicate any intent to allow reconsideration of factual determinations favorable to an accused.

While reconsideration of a panel decision by the court en banc is substantively different from reconsideration by another board or panel, the same policy considerations argue against merely substituting the judgment of one group of judges for that of another. There is little in the legislative history of the 1983 Act that suggests any change to the congressional policy applied by the Court of Military Appeals that factual decisions from a board of review *or* court of review favorable to the accused would not be further reviewed.[6]

The Senate Report addressed the 1983 amendment as follows:

> *Section 7(b)* amends Article 66(a) to permit a Court of Military Review, while sitting as a whole, to reconsider the decision of a panel of that court. Article 66 has been interpreted through judicial decision as neither expressly nor impliedly authorizing reconsideration of a panel decision by the whole court. *United States v. Wheeler,* 20 C.M.A. 595, 44 C.M.R. 25 (1971); *United States v. Chilcote,* 20 C.M.A. 283, 43 C.M.R. 123 (1971). By overriding the *Chilcote* and *Wheeler* decisions, *the legislation would [1] assist in resolving conflicts among panels and [2] promote finality of Court of Military Review decisions within the respective services, without the necessity to certify individual panel decisions to the Court of Military Appeals....*

S.Rep. No. 98–53, 98th Cong., 1st Sess. 28 (1983) (emphasis added).

It is important to note that neither of the two stated purposes of the legislation are compatible with en banc reconsideration of factual determinations by a panel of the court. In light of the clear congressional opposition to reconsideration of factual determinations favorable to an accused, the legislative history of the 1983 amendment does not clearly support the sweeping change represented by the statutory language.

The Court of Military Appeals considered the effect of the amended statutory language in *United States v. Flowers,* 26 M.J. 463 (C.M.A.1988). Chief Judge Everett, who had testified five years previously in support of the legislation, concluded in his concurring opinion that the purpose of the amendment

---

6. The prepared statement from Major General Hugh Clausen, The Judge Advocate General for the United States Army merely stated that "[t]he proposed legislation also provides for en banc reconsideration by the Courts of Military Review of decisions by single panels...." *The Military Justice Act of 1982: Hearings on S. 2521 Before the Subcomm. on Manpower and Personnel of the Armed Services,* 97th Cong., 2d Sess. 46.

was to resolve differences among panels of the Courts of Military Review as to legal issues. *Id.* at 466 (Everett, C.J., concurring). In his view, the amendment did not confer upon the Court of Military Review the power to reconsider en banc a factual finding or a determination of sentence appropriateness made by a panel. *Id.*

In the same opinion, Judge Cox concluded that the purpose of the amendment was to "overrid[e]" the decisions of the Court of Military Appeals in *United States v. Chilcote* and *United States v. Wheeler.* *Id.* at 465. His conclusion, however, should not be cited for the proposition that the amendment allows for en banc reconsideration of a factual insufficiency determination. It should be noted that both decisions relied upon rules of statutory construction to hold that the Courts of Military Review lacked authority for en banc reconsideration.

In this case, literal application of the statute could result in reversal of a factual insufficiency decision based upon a contrary reading of the same facts by judges of the same court. Such a procedure transgresses all of the congressional concerns about appellate reviews highlighted as early as 1949: an "unfair" result based on construction of the facts or credibility of a witness that is different from the original appellate court that decided the facts; a lack of finality for any decision of a panel of the court; an adverse impact on the independence of judges involved in panel decisions; and possible damage to the perception of justice by diametrically opposed results on factual questions that are matters of judgment.[7] For these reasons I conclude that the decision favorable to the accused by the Court of Military Review sitting as a panel may not be reconsidered by the court sitting en banc.

MORGAN, Judge, concurring in part and dissenting in part, with whom Chief Judge CUTHBERT, Senior Judge WERNER, Judge LANE, and Judge GONZALES concur:

We agree with the holding in the lead opinion that any panel decision, even one consisting of purely factual findings, may be reconsidered by the court sitting as a whole. We also agree with the standards which that opinion applies for determining whether a case should be reconsidered en banc. We disagree, however, with how those standards were applied to the facts of this case. Specifically, we would hold that when a panel erroneously overturns a conviction for the rape of a female soldier by a male soldier in a barracks setting, an exceptionally important question is presented, the proper resolution of which is crucial to high morale and good order and discipline in today's Army. The failure to reconsider and reverse the panel's clearly erroneous decision on this profoundly significant issue sends a dangerous message to all soldiers, male and female alike, that the military justice system does not adequately protect them from abuse by their dysfunctional colleagues.

Despite our initial vote to reconsider en banc, five judges now believe that this case does not present a sufficiently important issue for such reconsideration, although still fewer of them actually agree with the panel decision. The result is that further appellate review of the erroneous panel decision may effectively be precluded, since it was grounded on factual sufficiency. In the final analysis, this is simply an example of how our system, despite its many strengths, can sometimes fail to reach a just result in an individual case.

### I. The Panel Decision

This case was tried before a military judge, who personally observed the witnesses and heard their testimony. When asked to reconsider his verdict, he made very thorough and detailed special findings, which are attached as an appendix to this opinion. He concluded in those special findings that the rape victim did not consent to sexual intercourse, that the appellant knew and was not mistaken about her non-consent,[1] and that the sexual intercourse was forcible. The

---

7. Parts I and III at the dissenting opinion vividly illustrate these concerns.

1. This did not include an adverse determination of the appellant's credibility, since he elected not to testify at trial.

panel conceded the existence of force and assumed the absence of consent, but was "not convinced beyond a reasonable doubt that the appellant did not make an honest and reasonable mistake as to her lack of consent." *United States v. Pierce,* ACMR 9202428, slip op. at 6 (A.C.M.R. 10 Dec. 1993) (unpub.).

In our view, the evidence in the record of trial clearly supports the military judge's special findings in their entirety. The victim manifested her lack of consent in numerous ways: by refusing the appellant's oral request to have sex; by repeatedly rebuffing his attempt to kiss her by moving her head; by attempting to leave the room; by retreating from the appellant after he locked the door; by "scooting" away from him after he forced her into a corner and onto the bed; by telling the appellant not to do "whatever he was going to do," as he crawled on top of her; by reaching for a window ledge to get further away;[2] by again moving her head away when he attempted to kiss her; by repeatedly telling the appellant to "stop" and "not to do this;" by reminding him that they needed to sign in, in order to divert his attention; by holding up the waistband of her sweat pants as the appellant was forcing them down; and by squirming and wiggling her body in an effort to thwart the appellant's efforts to penetrate her vagina. In short, she made it perfectly clear to the appellant that she did not consent to his forcible act of sexual intercourse. Her obvious lack of consent is not a matter as to which the appellant could have been honestly and reasonably mistaken.

On the question of force, the panel conceded that the appellant used more force than that incidental to sexual intercourse,[3] although curiously they also characterized this as a "close question." This is despite the fact that the appellant blocked the victim's exit from his room by standing between her and the door; that he locked the door and turned off the lights; that he walked toward the victim, forcing her to retreat toward the bed; that he overcame her efforts to "scoot away" by positioning his body on top of her; that he continued his attempts to kiss her despite her actions to avoid being kissed; that he pulled her sweat pants down despite her resistance; that he forcibly inserted his penis into her vagina despite her pleas not to do so; and that he admitted to a fellow soldier, "Well, at first she was a little resistant, and I did it anyway...." These facts hardly present a "close question" that can be explained away with a suggestion that the appellant's actions were merely "efforts to sexually arouse and seduce" the victim.

A key fact in the panel decision was THE KISS.[4] During the assault, but prior to the intercourse, the appellant told his victim that "All you have to do is kiss me, and I'll come." Believing that this would satisfy him, and in an effort to avoid the threatened intercourse, she submitted to his demand, using her tongue. This coerced kiss, described by the victim as "not passionate," was clearly obtained by duress and given only in an attempt to end the appellant's unwanted advances. Unfortunately for the victim, she had been misled. After the kiss, the appellant forced her sweat pants down despite her continued resistance and over her relentless objections. He then managed to force his penis into her vagina by placing his hands under her buttocks to prevent her from successfully squirming away from him, which she had been able to do up to that point. After removing his penis from her vagina, the appellant ejaculated into his hand.

The appellant's deceitful manipulation of his victim by this demand for a kiss negates any possible suggestion or alleged perception of consent. The contention that he may have

2. She missed the window ledge of this second story room and struck the venetian blinds, the sound of which caused a "shattering" noise which was heard by two soldiers who were outside the barracks returning from a run. One of the soldiers identified the noise as coming from the appellant's room at the corner of the building.

3. Their exact language: *"Some of the force involved*—pulling down her sweatpants and lying on top of her—was clearly only incidental to sexual intercourse." *United States v. Pierce,* ACMR 9202428, slip op. at 4 (A.C.M.R.1993) (unpub.) (emphasis added).

4. To the extent the panel decision implied more than one kiss, it was wrong. A close reading of the record reveals there was but one.

been honestly and reasonably mistaken on that issue fails to explain her continued resistance and his escalated efforts after the kiss. When he finally had his way with her, the appellant understandably asked, "Do you hate me?"

Under Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (1988) [hereinafter UCMJ], the crime of rape requires both force and lack of consent, the proof of which is measured by the totality of the circumstances evidenced in the record of trial. *United States v. Bonano–Torres*, 31 M.J. 175 (C.M.A.1990); Manual for Courts–Martial, United States, 1984, Part IV, para. 45c(1)(b). Under Article 66(c), UCMJ, this court must be convinced beyond a reasonable doubt that a rape was committed before we can find the evidence factually sufficient. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987).

We are convinced, under the totality of the circumstances in this case, that the evidence is more than sufficient to prove the crime of rape *beyond a reasonable doubt*. The panel's contrary conclusion is clearly erroneous, objectively unreasonable, and as such constitutes a misapplication of material facts to that legal standard of proof.

The panel compounded their mistake by also concluding that no lesser included offenses were supported by the evidence. This is despite the fact that prior to the kiss there was *no basis to even raise mistake of fact as an issue*. Since the panel assumed that there was no consent, and several offenses had been committed by that point,[5] the inescapable conclusion is that the panel did not want to find the appellant guilty of anything.

5. For example, assault, assault consummated by a battery, and indecent assault.

6. See *United States v. Barboza*, 39 M.J. 596 (A.C.M.R.1994); and *United States v. Irvinspence*, 39 M.J. 893 (A.C.M.R.1994).

7. A rape committed by a person who is known to the victim to such an extent that the victim probably would not anticipate the criminal conduct. *See United States v. Webster*, 37 M.J. 670, 674 n. 3 (C.G.C.M.R.1993) (citing *Dolchok v. State*, 763 P.2d 977 (Alaska Ct.App.1988)).

The characteristics of date or acquaintance rape may include: (1) kissing, "necking," and

## II.   The En Banc Reconsideration Decision

The real issue dividing us is not sufficiency of the evidence, it is the significance of this case. We are in general agreement that the panel decision is wrong, but in fact it is more than wrong—it is arguably inconsistent with recent decisions of this court deciding similar cases,[6] and it clearly involves a question of exceptional importance.

When we decide to publish a decision as an Opinion of the Court, we do so because we consider the case so important that it should be disseminated beyond the litigants and made known throughout all Army trial jurisdictions and other branches of the Armed Forces. In such cases, it is important that our decision be correct. Decisions involving the issue of factual sufficiency in "acquaintance rape"[7] cases fall into this category of cases because of their subject matter. An erroneous panel decision on such a highly visible and extremely sensitive subject can have great repercussions on the behavior of soldiers in barracks or field settings.

One need look no further than the Coast Guard Court of Military Review decision in *United States v. Webster* to understand the importance of an "acquaintance rape" case which turns on factual sufficiency. Although each of the three appellate judges in that case wrote a separate opinion, they all agreed on the need for a statutory change to Article 120 which would provide useful guidance in this exceptionally important area. Their dilemma was triggered by the recognition that,

> there usually is a point at which a woman in a date or acquaintance rape situation accepts the fact that she is not going to be

fondling but no consent by the victim to subsequent sexual intercourse, (2) passive resistance by the victim to the sexual advances of her attacker, (3) the attacker's disregard of the victim's statement that she does not desire to engage in sexual intercourse, (4) the absence of physical threats by the attacker to his victim, (5) the failure of the victim to seize opportunities to escape from her attacker, (6) the failure of the victim to scream or cry out, (7) little or no observable physical injury to the victim, and (8) the failure of the victim to report the rape promptly. *See Webster*, 37 M.J. at 674.

able to prevent her attacker from having intercourse. If her attacker has forcibly expressed his intentions, she has reasonably manifested her lack of consent to this point, and the act of intercourse is consummated immediately thereafter, does the law require more?

*Webster*, 37 M.J. at 684.[8]

The lead opinion in *Webster* suggested that Article 120 be modified, consistent with the current trend in many state jurisdictions, toward defining rape as a sexual assault requiring only the lack of consent of the victim and establishing degrees of seriousness of the offense commensurate with the extent of force involved or other aggravating circumstances. It lamented the fact that,

> In the absence of a reform of Article 120, UCMJ, we are left to the unguided ad hoc application of the trial court's classification of 'degrees' of rape, as reflected in the sentence adjudged.... At a time when the number of women in the Armed Forces is growing ..., it is imperative that more action be taken to prevent date or acquaintance rape. Amending Article 120, UCMJ, would be one step in the right direction.

*Id.* at 675 n. 8.

A concurring opinion expressed the following concern:

> The statute provides no degrees of rape. The President, by Executive Orders promulgating the various editions of the Manual for Courts–Martial, has not provided varying degrees of punishment for rape, distinguished by the degree of force involved or other aggravating factors. Yet, in practice, rape has innumerable permutations, existing solely in the minds of those implementing the military justice system.... [T]he current guidance on the elements of the offense is less than lucid.

*Id.* at 683.

The dissenting opinion disagreed with the majority's finding of evidence sufficient for guilt, and expressed the belief that the military offense of rape required more than the record reflected:

> Various degrees of seriousness could be provided for in the Uniform Code of Military Justice with lowered proof requirements for the less serious sexual crimes, particularly with regard to proof of force and physical resistance. Until those amendments are made, however, rape, with a statutorily authorized penalty of death, continues to be an offense that can be treated as seriously as first degree murder. I do not believe the accused is guilty of a crime of that magnitude.

*Id.* at 685.

In the absence of executive or legislative clarification, the burden historically falls to the judiciary to confront important legal issues [9] and correctly decide them, case by case, in a manner which provides clear and meaningful guidance. Viewed in this light, the facts of every military rape case, particularly "acquaintance rape" cases, whose central issue is sufficiency of the evidence, become exceptionally important. They help define the permissible limits of relationships between male and female soldiers. If it is true, as the lead opinion asserts, that "[t]he criminality of the acts, on a case-by-case basis, is the concern of this court[,]" then certainly the question of what acts are criminal, and what acts are not, is exceptionally important. This requires no change in the law, merely a proper application of the facts to the law, as is amply demonstrated by the fourteen military rape cases cited in the lead opinion.

The lead opinion dismisses the panel decision as an anomaly having no value as legal precedent. This approach unnecessarily clouds an issue which should be clarified by this court at each and every opportunity. Although the opinion describes the rape of one soldier by another as "serious," "extremely harmful," "highly prejudicial," and "a matter of great concern to the leadership and command of the Army," it apparently is

---

8. The Coast Guard is not alone. The Air Force also struggles with factual determinations surrounding questions of force and lack of consent, which has produced some curious results. *See United States v. Watson*, 31 M.J. 49 (C.M.A.1990).

9. We do not mean to suggest that the facts of this case presented a difficult question—on the contrary, this was not a "close case."

still not deemed important enough to merit a correct decision from this court. The opinion concludes that: "This issue will not cause great concern within the military legal community if not resolved by an authoritative directive from this court." This view unfortunately leaves in place an authoritative opinion that is erroneous. The military justice system, and the United States Army, deserve better from us.

It is true that in the federal circuit courts, as with this court, en banc proceedings are not favored, and are convened only when the circumstances call for authoritative consideration and decision.[10] Although the rules of the Courts of Military Review mirror the federal rules, our appellate jurisdiction encompasses broad fact-finding authority normally unavailable to our civilian brethren. *See* Article 66, UCMJ. It follows that our en banc reconsideration authority is correspondingly broader in scope, as acknowledged in the lead opinion. What constitutes an exceptionally important question under this broader en banc authority logically and properly includes erroneous factual findings made at the appellate level.

The idea that a case decided on the basis of factual sufficiency has no value as precedent; can be distinguished from, and accordingly, does not conflict with any other case; and therefore does not involve a question of exceptional importance reflects an inappropriately narrow focus. This argument effectively precludes en banc reconsideration of any case grounded on factual sufficiency. After going to some length to make the case for, and then recognize, our unique en banc authority over factual findings, the lead opinion follows with an explanation of why it would never be exercised. We do not believe Congress gave us this power on one hand, but expects us to ignore it on the other. Such a view denigrates the stature of an institution possessed of "awesome" fact-finding powers. *United States v. Cole*, 31 M.J. 270 (C.M.A.1990).

---

**10.** According to information from the Office of the Clerk of Court, twelve requests for en banc reconsideration of panel decisions were received

### III. The Result

This court should never allow an erroneous panel decision to be issued on an exceptionally important question, even when the question is one of factual sufficiency. Today, having recognized our power to rectify such an error, the lead opinion chooses not to act. This is unfortunate, not only because of what happened to the victim, but also because of what happens to a legally and factually sufficient court-martial conviction.

There may be a natural reluctance to overturn an appellate decision that is favorable to an individual accused. As understandable as that sentiment might be, we should not allow it to deter us in this case from properly finding that the crime of rape was proven beyond a reasonable doubt. To do otherwise we must virtually ignore the facts in the record of trial, ignore the special findings of fact made by the trial judge, draw every inference possible against the rape victim and in favor of the appellant, and ignore decisions of this court in similar cases—or simply conclude that when one panel does so it is not an important enough matter to merit a controlled, measured, and necessary corrective intervention by the full court.

The result of our inaction is an erroneous panel opinion which misapplies facts to the law, and an en banc opinion which avoids deciding an exceptionally important question. For these reasons, and not merely because of our belief that the case is factually sufficient, we are compelled to dissent.

### APPENDIX

Appellate Exhibit X

United States

v.

SPC Kenneth L. Pierce
253–29–2325, U.S. Army
HHC, 4th Eng Bn
4th Inf Div (Mech)
Fort Carson, CO 80913–6001

### RECONSIDERATION AND SPECIAL FINDINGS

I have reconsidered my findings in the above entitled case prior to authenticating the rec-

---

by this court between 4 August 1993 and 24 January 1994, eleven of which were denied. This case was the exception.

ord of trial. The Prosecution was afforded an opportunity but declined to respond to the Defense request.

I find the evidence sufficient to establish all the elements of rape beyond a reasonable doubt and deny the Defense request that the finding of guilty be set aside.

## SPECIAL FINDINGS

(1) That, at approximately 2100 hours on 15 August 1992, in his PLDC barracks room at Fort Carson, Colorado, Specialist Pierce, the accused, committed an act of sexual intercourse, that is, penetration of the vagina by the penis, with Specialist M;

(2) That Specialist M. was a female and not Specialist Pierce's wife; and

(3) That the act of sexual intercourse was done by force and without Specialist M.'s consent.

Specialist M. is a 22 year old female who had been in the Army for approximately 4 years. She, along with Specialist Pierce, had recently begun the Primary Leadership Development Course. People attending the course who had not passed their PT test, which included Specialist M. and Specialist Pierce, were required to remain in the barracks over the weekend (15–16 Aug) and sign in hourly with the CO.

At approximately 1930 hours on 15 August, Specialist M., dressed in PT uniform (sweatshirt and sweatpants), went to Specialist Pierce's room to polish her boots and await the start of a card game which had been discussed by several people at dinner that evening. Specialist M. was only casually acquainted with Specialist Pierce, as a member of the class; and while Specialist M. sat at a desk, polishing her boots, and Specialist Pierce sat nearby reading a manual, they engaged in casual conversation for approximately one hour (going to sign in at about 2000 as they were required to do).

Shortly before 2100 hours, Specialist Pierce raised the subject of sex; and he asked Specialist M. if she would have sex with him. She testified very positively and adamantly that she replied: "In don't think so." Right after that, Specialist Pierce slid his chair over and attempted to kiss Specialist M. She avoided this by turning away, got up and began to gather her things and started toward the door, saying she was leaving. While Specialist M. gathered her things, Specialist Pierce went to the door of the room, turned the lock and shut off the lights.

Though the door could be unlocked from the inside and Specialist M. knew this, Specialist Pierce was now between her and the only exit from the room, and he began walking toward her. She made no attempt to get by him; but as he advanced, in order to avoid him, she was forced to retreat into the room, eventually coming to the bed in the farthest corner. At the bed she continued to retreat, attempting to scramble as far back into the corner as she could. As she retreated she repeatedly told Specialist Pierce, "not to do whatever he was going to do." She made a statement to this effect clearly, positively and repeatedly. Having retreated as far as the bed, Specialist M. continued to try to avoid Specialist Pierce by scooting as far as she could into the corner. By this time, however, he was able to get on top of her and attempted to kiss her and began to grope between her legs. She turned her head to avoid the kisses and squirmed and wriggled to avoid the groping; and she continued to tell him not to do what he was doing and attempted to divert his attention, talking about signing in.

Specialist Pierce, however, was persistent and intent on having sexual intercourse with Specialist M. In an attempt to get her to stop wriggling around so that this could be accomplished, he told her that all that was needed to satisfy him was a kiss. She, believing that she could end the incident without allowing Specialist Pierce to have intercourse with her, submitted to the kiss. While this belief on her part proved to be wrong, it was not unreasonable given the fast pace at which things were moving, her state of mind and the circumstances.

Specialist Pierce continued to persist even after the kiss and was more intent than ever upon having sexual intercourse with Specialist M. He said that he would just "put it in quick," but Specialist M. told him "don't," and continued to wriggle and squirm.

About this point in the incident Sergeant Mims knocked on Specialist Pierce's door and told him that he had to sign in. He responded that he would be there in five minutes. The struggle having abated while this exchange transpired, Specialist M. had an opportunity to yell for help. She testified very candidly, that she intended to and opened her mouth to do so; but, inexplicably to her, she was unable to call out. While it could be inferred from this that she was either consenting or was not forced to have intercourse, I do not do so. The situation in which Specialist M. found herself was intimidating and her actions indicate that she was frightened and resisting; furthermore the interruption by Sergeant Mims was an opportunity for Specialist Pierce to come to his senses and stop, which is what Specialist M.'s actions indicate she believed would happen from the beginning.

After Sergeant Mims left, however, Specialist Pierce became even more insistent, aggressive and forceful. Rather than merely groping Specialist M., he began to pull her sweatpants down. With her hands free she actively resisted his efforts by struggling to keep her pants up, but his weight on her and his strength eventually overcame her resistance. Finally, despite her continued squirming and wriggling, as well as verbal protestations, he penetrated her vagina with his penis.

After penetration, withdrawal and ejaculation, Specialist Pierce went to the latrine, while Specialist M. pulled up her sweatpants, got her things and started to leave. She was visibly upset and Specialist Pierce commented that he hoped she did not hate him. His concern indicates that he knew she had not consented and had been forced to do something that she did not want to do. Specialist M., after telling him what she thought of his actions, departed the room, signed in, went to her room and became ill, and eventually, when seen to be upset by her friends, reluctantly disclosed what happened.

Specialist M. was a candid and credible witness. Her testimony and demeanor and all the evidence in this case leave me in no doubt that she did not consent to intercourse with Specialist Pierce, that he knew and was not mistaken about her non-consent, and that he was intent on having sexual intercourse with her to the extent of forcing her to do so, especially after he told Sergeant Mims that he would only be five minutes.

Specialist Pierce made no verbal threats, displayed no weapons and never struck Specialist M.; but he blocked her exit from the room after she spurned his advances, forced her to retreat to the farthest corner of the room, pinned her down with the weight of his body, forcibly pulled down her sweatpants and penetrated her vagina with his penis despite her efforts to wriggle and squirm away. Specialist M. could have done more to resist; but under the circumstances of this case, what she did convinces me beyond a reasonable doubt that Specialist Pierce had sexual intercourse with her without her consent and by force.

/s/ Howard C. Eggers
Howard C. Eggers
Colonel, JA
Circuit Judge