UNITED STATES, Appellee

v.

GERARD J. DUGGAN, RICHARD F. GOMES, DAVID COMEAUX, and ROLAND E. SIMCOX, Prisoners, U. S. Army, Appellants

4 USCMA 396, 15 CMR 396

Lt Col James C. Hamilton, U. S. Army, for Appellants.

Lt Col William R. Ward, U. S. Army, Maj Irvin M. Kent, U. S. Army, 1st Lt Benjamin C. Flannagan, U. S. Army, and 1st Lt Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

The four appellants, together with two other accused, were tried by common trial under charges alleging mutiny in violation of Article 94, Uniform Code of Military Justice, 50 USC § 688. They pleaded not guilty, but were found guilty as charged; and Duggan, Gomes, and Simcox were each sentenced to be confined at hard labor for forty years, and Comeaux for a term of twenty-five years. The convening authority approved and the board of review in the office of The Judge Advocate General of the Army affirmed, after reducing the periods of confinement as follows: Simcox—12 years; Duggan and Gomes —10 years each; and Comeaux—7 years. We granted review in order that we might determine whether the law officer committed error in his instructions.

For orientation purposes, we make a brief resumé of the facts, as they will be detailed at length when we discuss the question of whether the evidence raises reasonably any included offenses. On November 16, 1952, the accused were in confinement at the Branch United States Disciplinary Barracks, Camp Gordon, Georgia. At approximately 8:30 in the evening two of the guards had a short argument in the orderly room. When they finished, several pris-

oners, who had congregated by the window, started throwing rocks and coal into the room, forcing the guards to leave the compound. The commanding officer of the barracks was summoned. He arrived with seven or eight guards, entered the enclosure, and ordered the prisoners to cease their violent activities. Instead of obeying, they increased the tempo of the revolt and forced the military authorities to retreat in order to avoid injury. For some thirty minutes the prisoners continued their activities. During this period hundreds of window panes were shattered; plumbing was ripped from the walls; door and door frames were torn from the buildings; and a certain building threatened with fire. Eventually Lieutenant Colonel Washburn, the Commandant of the Disciplinary Barracks, arrived, entered the compound, and ordered all prisoners who did not care to participate in the disturbance to march out of the barracks. Shortly after that order was given the disturbance ceased.

The appellants were identified as active participants in the disturbance and as a result were brought to trial. The specification under which they were tried alleged that they:

"... acting jointly and in pur-

suance of a common intent to override lawful military authority, did, at Camp Gordon, Georgia, on or about 16 November 1952, create violence by attacking a superior officer and guard personnel then on duty, by attempting to destroy buildings and other government property, and by exhorting other persons to join them in defiance of lawful military authority."

The above specification alleges the offense of mutiny. (See App 6c, page 476, Manual for Courts-Martial, United States, 1951). After the taking of evidence had been completed, the law officer instructed upon the elements of that offense. He then mentioned and gave the elements of the lesser included offense of breach of the peace. He afforded counsel an opportunity to submit any proposed instruction, but none was offered on any other included offense; and the record is barren of any suggestion that defense counsel wanted other offenses considered by the court-martial. It is now contended by the accused that the law officer erred in failing to give any instruction upon the offense of riot which, it is asserted, is a lesser included offense of mutiny.

Article 94, Uniform Code of Military Justice, supra, defines mutiny in the following language:

"Any person subject to this code . . . who with intent to usurp or override lawful military authority refuses, in concert with any other person or persons, to obey orders or otherwise do his duty or creates any violence or disturbance is guilty of mutiny. . . ."

It is apparent from the foregoing definition, and the manner in which violence or disturbance is disjointed from concert of action, that the Article can be interpreted reasonably to mean that in the military the offense of mutiny may be committed in either one of two ways. First, if the necessary intent to override military authority and concerted action are present, it may be committed by refusal to obey orders from a proper authority. Second, it may be committed by a person, with a similar intent, acting either alone or in concert with others, creating a violence or disturbance. Acknowledgment that there exists those two means by which the offense may be committed may be found in the wording of the discussion of the offense taken from paragraph 173 of the Manual:

"Except when the mutiny is committed by creating violence or disturbance, mutiny imports collective insubordination which necessarily includes some combination of two or more persons in resisting lawful military authority. Such concert of insubordination need not be preconceived nor is it necessary that the act of insubordination be active or violent. It may consist simply in a persistent and concerted refusal or omission to obey orders, or to do duty, with an insubordinate intent, that is, with an intent to usurp or override lawful military authority. The intent may be declared in words, inferred from acts done, or inferred from surrounding circumstances."

A cursory inspection of the foregoing quotation discloses that the first phrase excepts violence and disturbance from collective insubordination. Formerly, under the rule applicable in the Army and Air Force, all types of mutiny required collective action by two or more persons. See paragraph 154, pages 208–209, Manual for Courts-Martial, U. S. Army, 1949. However, it is to be borne in mind that the Article of War then in existence was worded entirely different than is the present punitive Article. Apparently the rule in force in the Naval service prior to the Code was that any type of mutiny could be committed by a single individual. See section 46, Naval Courts and Boards, 1937. The new Manual, paragraph 173, supra, suggests a compromise of the two conflicting concepts; and if Congress so intended, then we must give force and effect to that intention. A general rule of statutory construction is to construe an enactment so as to give force and effect to each phrase in its relation to others. If we do that, we arrive at the same conclusion expressed in the Manual. Any other interpretation

would require a transposition of the phrases used in Article 94. We are supported in our deduction by the language found in the Legal and Legislative Basis for the Manual, supra, at page 259. There it provides:

"A change in the Navy's definition of 'mutiny' is effected by the provision in Article 94 that the offense must be committed 'in concert with' another person or persons, except when violence or disturbance is created. Section 46, NC & B holds:

'To constitute mutiny, it is not necessary that there should be a concert of several persons, though it will be rare that this is lacking.'

A change for the Army and Air Force is effected by the applicability of subdivision (a) (3) of Article 94 to all persons subject to the Uniform Code instead of only to officers and soldiers as was the case under Article of War 67. All other persons presently subject to military law who are guilty of failure to suppress mutiny or sedition are chargeable under Article of War 96 in the Army and Air Force."

Our interpretation of the statute is made necessary because we seek to mark out the boundaries of the included offense of riot. That offense is proscribed by Article 116 of the Code, 50 USC § 710, which states:

"Any person subject to this code who causes or participates in any riot or breach of the peace shall be punished as a court-martial may direct."

Paragraph 195a of the Manual describes that offense as ·follows:

"The term 'riot' denotes a breach of the peace committed by three or more persons in furtherance of a common purpose to execute some enterprise by concerted action against any who may oppose them. . . .

"Without such a common purpose to be effected by concerted action, the acts of a tumultuous assembly of three or more persons, even though all commit breaches of the peace, do not constitute a riot. For example, in the case of an assemblage of persons engaged in discharging cannon crackers in violation of law, it was held that each person was intent on discharging his own cannon crackers and that there was no intent among the persons so assembled mutually to assist each other.

"It is not necessary that the common purpose be determined prior to assembly; it is sufficient if the assemblage actually begins to execute in a tumultuous manner a common purpose formed after it assembled."

Obviously under our interpretation of included offenses, the Manual definition of the offense of riot could not be included within mutiny committed by passive refusal to obey orders. Nor could it be included in a case where one person committed a violent mutiny. However, in the instant case, the allegations and proof show a mutiny committed in concert with others through violence, and it is toward that type of an offense that our consideration and discussion must be directed.

We are aware that riot is not listed with mutiny in the Table of Commonly Included Offenses (Appendix 12, Manual for Courts-Martial, supra). However, the note to that table expressly states that it is not all-inclusive. Moreover, as has been shown, there are cases of mutiny which could not include riot and for that reason it might cause con-·fusion to identify it in a table as an included offense. Accordingly, we must look to the allegations of the specification, and proof in support thereof, in each case to determine whether a lesser offense is placed in issue. While the standards we have adopted in considering whether one offense is included in another may be more generous than those prescribed by other courts, in an unbroken line of decisions we have made the test turn on both the charge and the evidence. When both offenses are substantially the same kind so that accused is fairly apprised of the charges he must meet and the specification alleges fairly, and the proof raises reasonably, all elements of both crimes, we have held they stand in the relation-

**399**

ship of greater and lesser offenses. In most settings our rule is identical with, but in some instances it varies a little from, the Manual requirement. The latter is found in paragraph 158 of the Manual and it states:

"An offense found is necessarily included in an offense charged if all of the elements of the offense found are necessary elements of the offense charged. An offense is not included within an offense charged if it requires proof of any element not required in proving the offense charged or if it involves acts of which the accused was not apprised upon his arraignment."

The only variation we perceive is that we measure the specification by the offense as charged and if the allegations contain ingredients which might be considered surplusage in so far as the principal offense is concerned, but are necessary to the included offense, then the relationship of greater and included offenses arises. In applying our rule in this instance, we turn to the Manual provisions for the elements of proof necessary to sustain convictions for mutiny and riot as found in paragraphs 173a and 195a, respectively. To those elements listed for violent mutiny we have added the element of concerted action with others as it was alleged in the instant case. For purposes of convenience, we columnize the elements of both:

| *Riot* | *Mutiny* |
|---|---|
| 1. That the accused were members of an assemblage of three or more persons; | 1. That the accused (more than three) were acting jointly (as alleged in the specification); |
| 2. that they caused or participated in a certain breach of the peace committed by the assemblage; | 2. that the accused created violence or a disturbance; |
| 3. facts and circumstances showing that the breach of the peace was committed in furtherance of a common purpose to execute an enterprise by concerted action against all opposition. | 3. that [they] did so with intent to usurp or overrule lawful military authority. |

Since the first two elements of proof listed above for each of the offenses are the same, any difference ██ which might be found must therefore be in the third. We are of the opinion that the intent to usurp or override lawful military authority is similar to, and in this instance, a more aggravated type of intent than the purpose to execute an enterprise by concerted action. We thus have in the specification and proof of the alleged greater offense all of the elements of the lesser. Had the court-martial members believed that the accused had a common intent merely to destroy the property by creating a disturbance, and that their purpose did not reach the level of an intent to override or usurp military authority, a finding of guilty of riot as a lesser included offense could have been returned.

Our attention has been called to the language of former board of review decisions which would appear to support a contrary theory by declaring mutiny and riot to be separate offenses, even though arising out of the same transaction. See United States v. McGary, 43 BR 1; United States v. Terry, 43 BR 381; and United States v. Lumpkins, 44 BR 149. The rationale of those cases is evidenced by a quotation from the Lumpkins case, supra (page 165):

"As above stated, the riot and the mutiny were contemporaneous, and although no point was made of it by the defense, it might be urged that, because of the coincidental circumstances surrounding both offenses, the Charges and Specifications as to each accused are objectionable as an unreasonable multiplication of charges against one person arising out of one transaction, or what is substantially one transaction (MCM

1928, par 27). Such, however, is not the case. As to 'each accused, the Specification of Charge I (joining in a mutiny) and the Specification of Charge II (committing a riot) allege separate and distinct offenses each of which is of grave character. Each, as has been shown, contains elements not embraced within the other. Proof of the offense of committing a riot would not necessarily disclose proof of the elements constituting a mutiny; and the converse is equally true. Riot implies a tumultuous disorder which terrorizes the populace whereas mutiny may exist when there is merely a passive and otherwise orderly but concerted refusal to obey superior military authority. A mutiny may be maintained by two persons in military service but a riot requires three."

An Army board of review, in a recent case, followed what we believe to be the better rule. In United States v. Grady, 13 CMR 357, four accused were tried for mutiny. The law officer instructed upon the offense charged and upon the lesser offense of breach of the peace. The board of review stated:

"Article 94, Uniform Code of Military Justice, and the discussion of such Article in the Manual for Courts-Martial, 1951, subparagraph 173a, shows that a mutiny can be created in two ways; first, by violence or disturbance; second, by refusal, in concert with others, to obey orders or otherwise accede to military authority, when either act is accompanied by an intent to usurp or override lawful military authority, and the specimen specification by the use of brackets makes this quite clear. However, in the case at bar both types of mutiny are alleged.

"Had only mutiny by creating unconcerted disturbance or violence been alleged, the law officer's instruction on the lesser included offense of breach of the peace might have been adequate. However, the specification also included the preliminary words charging 'in concert with' and since there was some evidence of concerted action, the issue of another lesser included offense, that of riot, in violation of Article 116, Uniform Code of Military Justice, was raised (CM 363319, Boykins, 11 CMR 296, decided 6 July 1953; CM 364169, Barton, 11 CMR 420, decided 30 July 1953)."

Because the latter case was decided after the enactment of the new Code and the principles announced therein are better tailored to present day proceedings, and in line with our previous decisions, we do not affirm the earlier holdings. In summation, we conclude that where it is within the allegations and proof, the offense of riot is necessarily included within mutiny by violence; and when it is placed in issue as a lesser included offense, the law officer is required to give appropriate instructions. See United States v. Clark, 1 USCMA 201, 2 CMR 107; United States v. Cline, 2 USCMA 411, 9 CMR 41; United States v. Strong, 1 USCMA 627, 5 CMR 55; and United States v. Floyd, 2 USCMA 183, 7 CMR 59.

We pass on now to consider whether the evidence raises reasonably the included offense of riot. The evidence we find in the record reveals the commission of a mutiny by violence. Inmates of the stockade stormed the orderly room, and threw bricks, stones, and coal at windows, and otherwise damaged the structure. Corporal Wheeler, who was in the orderly room, telephoned to the guards and the officer of the day. Thereafter, he was unable to leave the orderly room for an interval of about twenty minutes because of the violent activities of the prisoners outside. Eventually, he left and as he proceeded across the compound he was struck by a piece of coal. When Captain Hazel, an officer of the disciplinary barracks and officer of the day, arrived, he entered the compound and went to the orderly room. He was greeted with contempt, oaths, and threats of violence. He ordered the inmates to cease their activities. Instead of obeying the order, the prisoners turned their attentions toward him and his accompanying guards. They heaved stones and coal at them and the Captain was struck by a number of missiles. He again ordered the inmates to stop their violence without success as it continued until he and the guard

personnel were forced to retreat beyond the gate. Another captain sought to quell the revolt and he was greeted by a hail of coal and rocks. The prisoners followed the officers and guards and continued their attack upon them. Thereafter prisoners were seen wreaking havoc in the area. Some 200 windows were broken, the light globes broken, the plumbing torn loose, a stove torn down, window sashes destroyed, and doors ripped out. A mattress was set afire, placed through the window of the orderly room and one wall was badly scorched. During this time, remarks such as "let's tear up the joint," "let's set the joint on fire," and "let's get him" (Captain Hazel), were shouted among the prisoners. The turbulent commotion lasted for at least thirty minutes.

The above facts and circumstances are not disputed. On the contrary, the evidence of defense witnesses corroborated the related events and it, together with the testimony of Government witnesses, established by overwhelming proof the violence employed by the prisoners and the intent to override the commands and orders of the officers and noncommissioned officers. Corporal Wheeler, one of the guards, was forced to remain in the orderly room for some twenty minutes, and was rendered completely unable to exercise any control over the situation. The orders of two captains, when they appeared on the scene, were ignored and flaunted and they and the enlisted guard personnel who accompanied them were violently assaulted. No attempt was made on the part of defense to establish any reason for the violence other than to overthrow those in authority; and if there was a common purpose to execute some enterprise different from that, the record fails to disclose its existence. Under those circumstances, we conclude that the only offense placed in issue by the evidence was mutiny by violence.

Our conclusion that the offense of riot was not raised reasonably as an issue finds support in the tactics employed by the defense. The only fact which they attempted to dispute was the presence of the accused as participants in the disturbance. None of the accused took the witness stand to testify on the merits of the case but, by other testimony, they sought to establish an alibi. The defense witnesses asserted that the accused were not present and, therefore, could not have participated in the uprising. Defense counsel's arguments were directed toward discrediting prosecution's evidence on identity of the accused and he relied principally upon the theory that his clients were all elsewhere at the time the events occurred and should not be found as having participated in the rebellion. This amounted to an all or nothing theory and accused cannot now allege error on the part of the law officer for his failure to instruct sua sponte upon a theory which might have been unwanted by them.

We have recently disposed of a case involving a similar situation. In United States v. Bowers, 3 USCMA 615, 14 CMR 33, the accused was charged, tried, and convicted of unpremeditated murder and assault with a dangerous weapon whereby grievous bodily harm was intentionally inflicted. At the trial he advanced the defense of alibi. On appeal he contended that evidence of intoxication negated the presence of the specific intent necessary to sustain the finding on the assault specification and that an instruction on a lesser offense not involving specific intent should have been given. We held that, having elected to pursue one theory of defense at the trial, he could not claim error on appeal based on the law officer's failure to instruct on another hypothesis. What we said in that case is applicable in the present instance. We stated:

"We deal here with a record which shows a case well tried. No question of oversight or inadvertence breaks through defending counsel's trial tactics. A successful appellate system cannot be built if we are to permit an accused to elect one course at the trial level and then, if that turns out disastrously, grant him a reversal so that he may have a chance to retry the case on a theory he previously rejected. Particularly does that principle apply when, by defense tactics, the law officer is faced with a dilemma in presenting to the court inconsistent theories. The law officer

**402**

should not be placed in a situation where an accused can claim prejudicial error regardless of which course the law officer pursues, and this case seems to pose that problem. On the one hand, if he instructs on a theory which is unwanted and a verdict of a lesser included offense is returned, cannot the accused justly complain that the law officer injected an issue not raised by him? Is the accused not, if he so desires, entitled to limit the findings of the court to only guilty or not guilty of the principal offense? On the other hand, if the law officer does not so instruct, is accused entitled to a reversal because lesser included offenses were reasonably raised by the evidence? We believe accused is the one who must prevent that dilemma. If he does not want an inconsistent theory injected into the deliberations of the court-martial, he may make that election by stating that he does not want any instructions other than those given, as did counsel in this case. If, however, he desires to take a chance on a verdict of a lesser offense, he should specifically request appropriate instructions so that he cannot complain if they are given."

In the case at bar, the sole question put in issue by the defense was their presence at the time and place of the occurrence. The evidence and final arguments consisted only of attacking prosecution's evidence as being insufficient to show that accused were participants in the mutiny. The theory was alibi, and the law officer instructed fully and completely upon that issue. At the conclusion of his instructions, he asked counsel if they had any requested instructions and defense counsel made no request for an instruction on the lesser offense of riot. Under those circumstances, we conclude that it was not error for the law officer to fail to give an instruction, without request, upon a theory rejected inferentially by the defense.

For the foregoing reasons, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring):

I am able to concur outright in the Court's opinion—on the understanding that my brothers mean directly to relate their reference to the effect of the defense's theory of alibi to the evidential posture of the instant case. That is to say, that they intend the terminal paragraphs of the opinion to express a make-weight argument and not an alternative ground.