508

UNITED STATES, Appellee,

v.

Inmate Jose S. SANCHEZ, 571–04–8853, A person in the custody of the Armed Forces serving a sentence imposed by court-martial, Appellant.

ACMR 9300713.

U.S. Army Court of Military Review.

27 June 1994.

For Appellant: Major Michael A. Egan, JAGC, Captain Clement B. Lewis, III, JAGC (on brief).

For Appellee: Colonel Dayton M. Cramer, JAGC, Major James L. Pohl, JAGC, Major Kenneth T. Grant, JAGC, Captain Louis E. Peraertz, JAGC (on brief).

Before GRAVELLE, JOHNSTON, and BAKER, Appellate Military Judges.

OPINION OF THE COURT

GRAVELLE, Senior Judge:

Contrary to his plea, the appellant was convicted by a military judge sitting as a general court-martial of mutiny, in violation of Article 94, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 894 (1988). The convening authority approved the adjudged sentence of confinement for one year.

Inmate Sanchez, a sentenced prisoner at the United States Disciplinary Barracks, Fort Leavenworth, Kansas, was convicted by general court-martial in 1981 of unpremeditated murder and sentenced inter alia to forty years confinement. This court affirmed his conviction. *United States v. Sanchez,* CM 441581 (A.C.M.R. 31 Jan. 1983) (unpub.), *pet. denied,* 17 M.J. 18 (C.M.A.1983). In 1982, he was convicted by a second general court-martial of an assault on a fellow prisoner and two assaults on military police guards at the Disciplinary Barracks, and was sentenced inter alia to three additional years of confinement. We affirmed this second conviction. *United States v. Sanchez,* CM 443303 (A.C.M.R. 27 Oct. 1983) (unpub.), *pet. denied,* 18 M.J. 94 (C.M.A.1984). In his third and most recent court-martial in 1993, he was convicted of the mutiny charge at issue in this case.

The appellate defense counsel submitted Inmate Sanchez' case to this court on its merits. After reviewing the record, we specified the following three issues:

I.

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO DISMISS THE CHARGES FOR A VIOLATION OF THE APPELLANT'S RIGHT TO DUE PROCESS AND A SPEEDY TRIAL.

II.

WHETHER, UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE, THE APPELLANT WAS PROPERLY CONVICTED OF A VIOLATION OF ARTICLE 94, UCMJ, MUTINY, FOR OVERRIDING MILITARY AUTHORITY.

III.

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO ORDER APPROPRIATE ADMINISTRATIVE CREDIT ON SENTENCING AFTER FINDING THAT THE APPELLANT WAS SUBJECTED TO ILLEGAL PRETRIAL PUNISHMENT.

Having considered the briefs filed by appellate government counsel and by appellate defense counsel, we find no error in the military judge's rulings or findings. We will first discuss specified issue II, followed by specified issues I and III considered together.

I.

A. Facts

Following a disturbance at the Disciplinary Barracks on 12 May 1992, the appellant was charged with mutiny. The specification of which the appellant was convicted reads as follows:

In that Inmate Jose S. Sanchez, a person in the custody of the armed forces serving a sentence imposed by court-martial, Security Battalion (Provisional), United States Disciplinary Barracks, Fort Leavenworth, Kansas, 66027–7100, with intent to usurp and override lawful military authority, did, at Fort Leavenworth, United States Disciplinary Barracks (USDB), on or about 12 May 1992, refuse in concert with others whose names are unknown, to obey the orders of the Director of Custody, LTC Bartlett, and his subordinates to lockdown, and organized other persons to join him in defiance of the order. This is in violation of Article 94 of the UCMJ.

The evidence, as presented at trial, showed that a group of prisoners, upset over clemency and parole policies, met on the afternoon of 12 May 1992 in the bleachers of an athletic field to discuss plans for airing their griev-

ances. There was evidence that the appellant "seemed to be running the meeting" and advocated that the inmates refuse to obey the "lockdown" order that evening and that they not go to work the next morning. While some inmates advocated violence, the appellant urged a peaceful demonstration.

Other evidence described a disturbance that same evening in one wing of the prison in which over three hundred prisoners refused to go to their cells when lockdown was ordered at 2230 hours. Some prisoners built a barricade in the cell block from pool tables and other furniture. Several witnesses testified that the appellant was actively involved as a leader of the concerted refusal. The ranking guard in the cell block, a noncommissioned officer, testified that the appellant prevented him from communicating with another guard. However, at the same time, the appellant dissuaded other prisoners from forcibly detaining the noncommissioned officer but instead told him to leave the guard cage[1] and the cell block. The sergeant complied and left the cell block.

The security battalion commander testified that the appellant refused his order to go to his cell, and that the appellant told him that the inmates "would stay out of their cells and not comply with instructions until such time as somebody from Washington, D.C. came down and listened firsthand to their complaints." Shortly after this exchange, some prisoners began to "ransack" the cell block. The battalion commander agreed that the appellant helped keep the demonstration nonviolent, expressed regret that some property destruction was occurring, and assisted in evacuating an inmate from the cell block after the inmate suffered a seizure during the disturbance.

Although the prisoners eventually returned to their cells that night, there were some prisoners who refused to report for work in the ensuing days.

Testifying in his own defense, the appellant admitted that he went to the afternoon meeting at the athletic field bleachers. He claimed that he counselled against violence and against violating the lockdown order. The appellant testified that he tried to comply with the lockdown order that evening, but was prevented by other prisoners from doing so. He denied being a ringleader or spokesman for the prisoners participating in the disturbance.

Inmate Sanchez' defense counsel argued to the military judge that the appellant should be acquitted because the "defense of necessity" existed. Counsel argued that the appellant merely pretended to participate in the disturbance in order to channel the inmates' potential for violence into peaceful resolution of their grievances and therefore, lacked the specific intent to override authority.

The military judge, after convicting the appellant, but prior to imposing sentence, commented that he believed that the appellant actively participated in the disturbance, but tried to prevent violence. The military judge rejected the "defense of necessity" because courses of action other than assuming a leadership role were available to the appellant. Using our independent fact-finding powers under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we agree with the military judge's assessment of the evidence.

### B. Law

Article 94(a), UCMJ, provides in pertinent part that "[a]ny person subject to this chapter who ... with intent to usurp or override military authority, refuses, in concert with any other person, to obey orders or otherwise do his duty or creates any violence or disturbance is guilty of mutiny...."

Two different forms of mutiny are listed in the Manual for Courts–Martial: mutiny by creating violence or disturbance, and mutiny by refusing to obey orders or perform duty. Manual for Courts–Martial, United States, 1984, Part IV, para. 18b(1) and (2) [hereinafter MCM, 1984]. *See also United States v. Duggan,* 4 U.S.C.M.A. 396, 398, 15 C.M.R. 396, 398, 1954 WL 2307 (1954).[2] The appel-

---

1. The guard cage was located inside the cell block and was the duty station of the senior guard. According to the witness, it contained "keys, tools, radios, control to the cells."

2. Interestingly, *Duggan* and all other published opinions since 1951 dealing with convictions for mutiny involve prisoners in confinement facilities.

lant was convicted of the latter form of mutiny. The elements of mutiny by refusing to obey orders or perform duty as set out in MCM, 1984, Part IV, para. 18b(2) are:

(1) That the accused refused to obey orders or otherwise [refused] to do the accused's duty;

(2) That the accused, in refusing to obey orders or perform duty acted in concert with another person or persons; and,

(3) That the accused did so with [the] intent to usurp or override lawful military authority.

The Manual further provides that:

Mutiny by refusing to obey orders requires collective insubordination and necessarily includes some combination of two or more persons in resisting lawful military authority. This concert of insubordination need not be ... active or violent, [and] [i]t may consist simply of a persistent and concerted refusal or omission to obey orders, or to do duty, with an insubordinate intent, that is, with an intent to usurp or override lawful military authority.

MCM, 1984, Part IV, para. 18c(1)(b). *See United States v. Woolbright,* 12 U.S.C.M.A. 450, 31 C.M.R. 36, 38–39, 1961 WL 4518 (1961); *United States v. Duggan,* 4 U.S.C.M.A. 396, 15 C.M.R. 396, 1954 WL 2307 (1954); *United States v. Sood,* 42 C.M.R. 635, 1970 WL 7185 (A.C.M.R.1970), *pet. denied,* 42 C.M.R. 356 (C.M.A.1970). "Override" has been defined in one case to mean "set aside, supersede, annul, disregard the wishes of, or to domineer over another." *United States v. Woolbright,* 30 C.M.R. 488, 493, 1960 WL 4661 (A.B.R.1960), *rev'd for legal insufficiency,* 12 U.S.C.M.A. 450, 31 C.M.R. 36, 38–39, 1961 WL 4518 (1961), (quoting Webster's New International Dictionary (2d ed)). "The intent may be declared in words or may be inferred from acts, omissions or surrounding circumstances." MCM, 1984, Part IV, para. 18c(1)(b).

■ "Mutiny by disobedience or refusal to [obey orders] ... is a specialized type of conspiracy in which the co-actors must share a common purpose. There must be concert of action and concert of intent. To hold otherwise would mean that mere joint disobedience of orders constitutes this gravest of military crimes." *Woolbright,* 31 C.M.R. at 39 (quoting Winthrop's Military Law and Precedents, 2d ed., 1920 Reprint, 578–79). Therefore, a mere intention to defy authority, without more, is not enough to constitute the intent to override or usurp authority. "[A] collective intent to defy authority ... falls far short of a collective intent to usurp or override military authority." *Sood,* 42 C.M.R. at 640.

■ When the persons involved merely demonstrate "an intention to implore and invoke the very military authority which they are charged with seeking to override" there is no intent to override or usurp military authority. *Id.*

■ The "defense of necessity," as argued by the appellant's defense counsel, is not recognized as a defense in military law. *United States v. Banks,* 37 M.J. 700, 702 (A.C.M.R.1993) (construing *United States v. Rankins,* 34 M.J. 326 (C.M.A.1992)). While separate and distinct, the common law defenses of duress and necessity are closely related. *See United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) and *Banks,* 37 M.J. 700. The defense of duress requires that an accused's participation in an offense be "caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury if the accused did not commit the act." Rule for Courts–Martial 916(h). Moreover, if there is a "reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened, this defense shall not apply." [3] *Id.*

The test we must use for determining legal sufficiency is whether, in considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could

---

**3.** The military judge's comments prior to sentencing show that he understood the difference between the defense of necessity and the defense of duress. In commenting on other reasonable alternatives being available to the appellant, he was in effect rejecting the defense of duress in this case.

have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and having made allowances for not personally having observed the witnesses, we are ourselves convinced of the appellant's guilt beyond a reasonable doubt. UCMJ art. 66(c); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In carrying out our unique factual sufficiency duties of Article 66(c), UCMJ, we must consider, but need not defer to, the credibility determinations of the trier of fact. *United States v. Irvinspence*, 39 M.J. 893 (A.C.M.R.1994).

### C. Analysis

■ We hold that the evidence is legally and factually sufficient to support the appellant's conviction for mutiny. In reviewing the record, we find a collective intent to override lawful military authority, which was formed at the bleachers and carried into execution at "lockdown" that evening. While there may have been differences of opinion among the prisoners as to the exact methods of overriding the authority, we find that there was a common intent to override that authority and not merely to defy it.

Unlike the situation in *Woolbright*, we do not have individual action escalating into a series of individuals disobeying orders to return to work. Here, there is sufficient evidence that the accused advocated and incited the collective effort of the inmates to resist orders. In the words of the security battalion commander, the appellant "orchestrated, energized, and focused" the inmate disturbance. Other witnesses testified consistently with this observation.

■ Unlike *Sood*, despite the appellant's comment to the security battalion commander at one point after the refusal to obey the order for lockdown, there was no direct appeal to an immediately available lawful authority to redress grievances. In *Sood*, the prisoners at the Presidio of San Francisco confinement facility sat down, refused to go

to work, and demanded that the confinement facility commander be summoned so they could air their grievances about confinement facility policies. In the present case, when ordered by the U.S. Disciplinary Barracks security battalion commander to return to their cells, the appellant as spokesman for the inmates refused until "somebody from Washington" came to the Disciplinary Barracks to address the inmates' concerns. Here, Inmate Sanchez and other inmates did not "implore and invoke the very military authority which they are charged with seeking to override." *Sood*, 42 C.M.R. at 640. We therefore distinguish *Sood* on its facts.

In finding factual sufficiency, we have taken into account that the military judge has seen and heard the witnesses and has resolved the factual disputes generally in favor of the government. We find no reason to disturb his credibility determinations, and our independent review of the record convinces us that the appellant is guilty of mutiny. Further, we find no evidence of record whatsoever to support a defense of duress in this case.

### II.

■ After the disturbance ended and after Disciplinary Barracks authorities identified the appellant as a ringleader, the security battalion commander placed Inmate Sanchez in "administrative segregation" pending an investigation of the disturbance. Inmate Sanchez remained in "administrative segregation" from mid-May 1992 until his court-martial in February–April 1993. During the initial few weeks of "administrative segregation," the appellant was incarcerated in a "bubble cell," a cell designed for maximum control of prisoners; thereafter, he was placed in a "normal" cell within the maximum confinement cell block.

Based on the lengthy period of administrative segregation, the defense counsel moved at trial for dismissal of charges for lack of a speedy trial, citing the Fifth Amendment Due Process Clause and *United States v. Vogan*, 35 M.J. 32 (C.M.A.1992).[4]

---

4. *Vogan* held that the Sixth Amendment speedy trial right did not apply to a prisoner incarcerat-

ed as the result of a previous conviction, but the Fifth Amendment Due Process Clause may apply

"Administrative segregation" is a form of "administrative discipline" that may be imposed upon a prisoner at the United States Disciplinary Barracks under the provisions of Dep't of Defense Directive 1325.4, Confinement of Military Prisoners and Administration of Military Correctional Programs and Facilities and Army Reg. 190–47, United States Army Correctional System: Military Police, para. 9–5 (C1, 1 Nov. 1980). *See generally* Chapter 9, AR 190–47. It "is not an 'arrest' or 'accusal' for speedy trial purposes." *United States v. Vogan,* 35 M.J. at 33, (quoting *United States v. Mills,* 641 F.2d 785, 787 (9th Cir.1981), *cert. denied,* 454 U.S. 902, 102 S.Ct. 409, 70 L.Ed.2d 221 (1981)).

The commander of the security battalion at the Disciplinary Barracks testified at trial that administrative segregation is a prison security measure. *See generally United States v. Coder,* 39 M.J. 1006 (A.C.M.R.1994). He also testified that his decision to order the appellant into administrative segregation was entirely separate from court-martial proceedings, and was based on his determination that the appellant was "a threat to the institution."

Evidence presented on the motion at trial indicated that the appellant had a right to a "custody reduction board" hearing within thirty days after imposition of administrative segregation, and in the absence of a board hearing, the appellant should have been automatically taken out of administrative segregation.[5] The military judge found that this board had not been held at all, and that the appellant had not been taken out of adminis-

trative segregation after thirty days as required by Disciplinary Barracks Regulation No. 15–1. The military judge also expressed concern that the appellant's right to counsel had been violated. The evidence showed that the appellant had asked for but not seen a defense counsel for some time after being placed in administrative segregation.

In ruling on the motion to dismiss charges, the military judge relied upon *Vogan,* 35 M.J. 32.[6] He found no prejudice to the appellant's ability to present a defense and ruled that dismissal of the charges was not warranted. However, the judge found that the failure of the Disciplinary Barracks to follow its own regulation violated the appellant's due process rights, and, with the concurrence of the trial counsel, ruled that some relief on sentencing was warranted.

Later in the court-martial, at the time he sentenced the appellant, the military judge considered the due process violation in retaining the appellant in extended administrative segregation as tantamount to imposition of prior punishment, and imposed a sentence with that in mind. The trial counsel had argued for a five-year sentence. The military judge sentenced the appellant to one year confinement and indicated on the record that, but for the due process violation, he would have imposed a sentence more in line with the trial counsel's recommendation.

We find no abuse of discretion in the military judge's ruling, and under the circumstances, we find his remedy and the sentence appropriate.[7]

to protect a prisoner against egregious trial delays. Inmate Sanchez' defense counsel acknowledged during argument on the motion that the true nature of the motion was a request for dismissal of charges because of a denial of due process rather than for lack of a speedy trial.

5. This custody reduction board hearing is apparently different from the Discipline and Adjustment (D & A) Board hearing discussed in *Coder.* It was undisputed at trial that the appellant had requested a delay in the D & A board hearing until after the court-martial was completed. The military judge, however, found that the appellant had not requested a delay in the custody reduction board.

6. The appellant, in responding to the issues specified in this case, asserts that his right to a speedy trial under Article 10, UCMJ, has been

violated. This issue was not raised at trial and was arguably waived. Even if not waived, we find no merit in it. The appellant argues that, because the U.S. Court of Military Appeals addressed only the Fifth and Sixth Amendment protections and chose not to address the implications of Article 10, UCMJ, in *Vogan,* the "due diligence" standard of Article 10, UCMJ, must apply to his case. We do not agree. We believe that a fair reading of *Vogan* makes it clear that the speedy trial protections of Article 10, UCMJ, likewise do not apply to sentenced prisoners.

7. The government contends in its brief that the military judge was wrong in granting *any* relief because of wording in our opinion in *Coder,* 39 M.J. at 1009. As noted in that opinion at 1009 n. 6, the judicial remedy for administrative due process violations involving "administrative dis-

We have reviewed the errors personally asserted by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find no merit in them.

The findings of guilty and the sentence are affirmed.

Judge JOHNSTON concurs.

BAKER, Judge, concurring:

I fully concur with the lead opinion, particularly its rejection of the government's argument that the military judge erred in granting relief for pretrial punishment in this case. I write separately to express a continuing concern with forfeiture of "Good Conduct Time" after the court-martial of a sentenced prisoner. *See United States v. Coder*, 39 M.J. 1006, 1010 (A.C.M.R.1994) (Baker, J., dissenting).

In a letter submitted to the convening authority pursuant to Rules for Courts–Martial 1105 and 1106, the appellant's civilian defense counsel indicated that the appellant forfeited 1300 days (3 years and 205 days) of good time as the result of a Disciplinary and Adjustment Board convened subsequent to his court-martial and considering the same misconduct. The convening authority apparently set aside this forfeiture of good time after a separate administrative appeal.[1] Such an appeal would have been unnecessary had confinement officials been instructed that forfeiture (as opposed to withholding of) good

time after a court-martial involves double punishment and is improper.[2]

It is logical that good time "credit" should be able to be *withheld* at the end of any period (e.g., one month, six months, one year but no more) during which a long-term prisoner commits an offense, separate and apart from any court-martial sentence. It seems to me, though, that *forfeiture* of good time already received is tantamount to punishment. *See United States v. Rosencrons*, 34 C.M.R. 512, 1963 WL 4780 (A.B.R.1963). Accordingly, while it may be appropriate for a court-martial to merely "consider" withheld or potentially withheld good time in formulating appropriate punishment, forfeited good time should be affirmatively credited to ensure there is no double punishment. For the same reason, once a sentence has been adjudged, forfeiture of good time should no longer be an option.

I do not conclude that good time must be vested and thereby not be subject to forfeiture at all, although that is the rule in prisons run by the U.S. Bureau of Prisons. 18 U.S.C. § 3624(b) (1984), *amended by* 18 U.S.C. § 3624(b) (1990).[3] Nor do I mean to suggest that this court should review (or even has the authority to review) the procedural or substantive correctness of Disciplinary and Adjustment Boards. It is, however, entirely appropriate that we consider double

---

cipline" *normally* is determined elsewhere. Here, the issue was raised in the context of a speedy trial/due process motion, so the facts needed to decide the motion were properly before the military judge. We commend him for fashioning an appropriate remedy when confronted with the problem.

1. In a separate letter submitted with Rules for Courts–Martial 1105/1106 matters, the appellant thanked the convening authority "for the return of my good time."

2. Combining the forfeiture of good time with the adjudged confinement of one year, the total sanction for the appellant's misconduct would have been just less than five years had the convening authority not set aside the forfeiture of good time. Coincidentally, the military judge indicated he would have considered a sentence in that range had it not been for treatment tantamount to *pretrial* punishment. This coincidence involves at least the appearance of impropriety,

although the convening authority's action moots any real issue.

3. 18 U.S.C. § 3624 specifies that "credit" for satisfactory behavior "vests at the time it is received" and "may not later be withdrawn." Dep't of Defense Directive 1325.4, Confinement of Military Prisoners and Administration of Military Correctional Programs and Facilities (May 19, 1988), on the other hand, specifically provides that "[i]f a prisoner violates the rules of the institution or commits any offense during confinement, all or any part of earned good conduct time may be forfeited." This directive also provides that "[p]rocedures employed in the computation of sentences shall conform to those established by the Department of Justice (DoJ) for Federal prisoners *unless they conflict with this Directive*." (emphasis added). Accordingly, the rational for conformity with DoJ procedures as defined in *United States v. Allen*, 17 M.J. 126 (C.M.A.1984), is not present in this case.

punishment issues raised in cases submitted for our review.